THOMAS J. BATA et al., Respondents, *v.* JAN A. BATA, Appellant, et al., Defendants.

Argued May 21, 1953; decided October 23, 1953.

*Henry Cohen, Rudolf B. Schlesinger, Jonathan B. Bingham*
and *Beate Bloch* for appellant.  I. The new finding below that
Thomas Bata's intentions as expressed in his will and memo-
randum of sale were sham, and the documents intended to be
" fiction ", is erroneous as a matter of law.  (*Chisholm* v.
*Commissioner of Internal Revenue,* 79 F. 2d 14; *Sawtell* v. *Com-
missioner of Internal Revenue,* 82 F. 2d 221; *Johnson* v. *Com-
missioner of Internal Revenue,* 86 F. 2d 710; *Matter of Kennedy,*
159 Mich. 548; *Matter of Smith,* 308 Mich. 518; *Fleming* v.
*Morrison,* 187 Mass. 120; *Lister* v. *Smith,* 3 Sw. & Tr. 282;
*Wright* v. *Delafield,* 25 N. Y. 266; *Ga Nun* v. *Palmer,* 216 N. Y.

603; *Cudney* v. *Cudney,* 68 N. Y. 148.) II. Thomas Bata's wishes as expressed in his will and in the accompanying memorandum of sale should be given effect. (*Matter of Fowles,* 222 N. Y. 222; *Matter of Rausch,* 258 N. Y. 327; *Bizzey* v. *Flight,* [1876] L. R. 3 Ch. D. 269; *Matter of Dimmitt,* 141 Neb. 413; *Arrington* v. *Brown,* 235 Ala. 196; *Jennings* v. *Reeson,* 200 Mich. 559; *White* v. *Reading,* 293 Mo. 347; *Woods* v. *Gilson,* 178 Mass. 511; *Loring* v. *Sumner,* 23 Pick. 98 [Mass.]; *Reynolds* v. *Reynolds,* 224 N. Y. 429.) III. Marie Bata and Thomas Bata are barred from asserting any rights to Thomas Bata's business property. (*Schloss Bros. & Co.* v. *Bennett,* 260 N. Y. 243; *Lieberman* v. *Templar Motor Co.,* 236 N. Y. 139; *Duke of Leeds* v. *Lord Amherst,* 2 Phillips 117, 41 Eng. Rep. 886; *Close* v. *Glenwood Cemetery,* 107 U. S. 466; *Turner* v. *American Metal Co.,* 268 App. Div. 239, 295 N. Y. 822; *Rothschild* v. *Title Guar. & Trust Co.,* 204 N. Y. 458; *Kent* v. *Quicksilver Mining Co.,* 78 N. Y. 159; *Pollitz* v. *Wabash R. R. Co.,* 207 N. Y. 113; *Chamberlain* v. *Chamberlain,* 43 N. Y. 424; *Lee* v. *Tower,* 124 N. Y. 370; *Beetson* v. *Stoops,* 186 N. Y. 456; *Smith* v. *Wait,* 4 Barb. 28; *Matter of Fowles,* 222 N. Y. 222.) IV. Marie Bata and Thomas Bata must be denied relief — even upon the finding below that a "fiction" was perpetrated. (*Burnet* v. *Brooks,* 288 U. S. 378; *First Nat. Bank of Boston* v. *Commissioner of Internal Revenue,* 63 F. 2d 685; *State of Colorado* v. *Harbeck,* 232 N. Y. 71; *Johnson* v. *Yellow Cab Co.,* 321 U. S. 383; *Leonard* v. *Poole,* 114 N. Y. 371; *Holman* v. *Johnson,* 1 Cowp. 341, 98 Eng. Rep. 1120; *Kalman* v. *Kalman,* 275 App. Div. 715; *Carmine* v. *Murphy,* 285 N. Y. 413; *Flegenheimer* v. *Brogan,* 284 N. Y. 268; *Reiner* v. *North Amer. Newspaper Alliance,* 259 N. Y. 250.)

*Inzer B. Wyatt, Alfred Jaretzki, Jr.,* and *Robert MacCrate* for respondents. I. The Court of Appeals may not consider the new theory of a testamentary gift because the case was not tried on any such theory. (*Salisbury* v. *Howe,* 87 N. Y. 128; *United Press* v. *New York Press Co.,* 35 App. Div. 444, 164 N. Y. 406; *Caponigri* v. *Altieri,* 165 N. Y. 255; *Racine* v. *Morris,* 201 N. Y. 240; *Persky* v. *Bank of America Nat. Assn.,* 261 N. Y. 212; *Maloney* v. *Hearst Hotels Corp.,* 274 N. Y. 106.) II. The courts below correctly found title in the heirs to the property in suit. III. Arguments of "laches", "acquiescence" and the

like cannot defeat the legal title of respondents to these 826 Leader shares. (*Pollitz* v. *Wabash R. R. Co.,* 207 N. Y. 113; *United States* v. *Mack,* 295 U. S. 480; *Brant* v. *Virginia Coal & Iron Co.,* 93 U. S. 326; *Oklahoma* v. *Texas,* 268 U. S. 252; *Mayor of City of N. Y.* v. *Law,* 125 N. Y. 380; *Hatch* v. *Ferguson,* 57 F. 966, 68 F. 43; *Commissioner of Internal Revenue* v. *Burke,* 62 F. 2d 7.) IV. Respondents have committed no wrong which would forfeit their property. (*State of Colorado* v. *Harbeck,* 232 N. Y. 71; *Loughran* v. *Loughran,* 292 U. S. 216; *National Bank & Loan Co.* v. *Petrie,* 167 N. Y. 589, 189 U. S. 423; *Planters' Bank* v. *Union Bank,* 16 Wall. [U. S.] 483.) V. The documents do not contain any testamentary gift to appellant. (*Matter of Rausch,* 258 N. Y. 327; *Post* v. *Hover,* 33 N. Y. 593; *Bradhurst* v. *Field,* 135 N. Y. 564; *Dreyer* v. *Reisman,* 202 N. Y. 476; *Booth* v. *Baptist Church,* 126 N. Y. 215; *Matter of Bagot,* [1893], 3 Ch. 348; *Zimmerman* v. *Hafer,* 81 Md. 347; *Noble* v. *Tipton,* 219 Ill. 182; *Jennings* v. *Reeson,* 200 Mich. 559; *Allenbach* v. *Ridenour,* 51 Nev. 437.) VI. There is no '' new finding '' which is '' without evidence to support it ''. VII. The new theory should not give appellant a new trial.

FROESSEL, J. We are here confronted with an unfortunate family controversy between plaintiffs, the widow and only son of Thomas Bata, on the one hand, and defendant Jan Bata, Thomas's twenty-year younger half brother, on the other. Thomas Bata (hereinafter referred to as Thomas) was an unusually capable Czech industrialist, the ninth in line of a family of shoemakers, dating from the sixteenth century. Though born in humble circumstances, he emerged from obscure beginnings as a provincial shoemaker and created a huge industrial shoe empire which had its inception in the town of Zlin, Province of Moravia, Czechoslovakia.

By the year 1931, the Zlin factory was the largest in Europe, turning out 150,000 pairs of shoes a day and equipped for the manufacture of 200,000 pairs daily; its shoes were sold on the continents of Europe, Asia, Africa and North America, including such countries as the United States, England, Iceland, most of the nations of Europe, the Near East, and a number of island possessions. According to the findings below, the value of Thomas's interest in this vast enterprise prior to his death

was between thirty and forty million dollars. While in good health and actively at work further extending his operations into many parts of the world, he met his death at the age of fifty-six in the early morning of July 12, 1932, in an airplane accident at Zlin while en route to visit his son in the factory in Switzerland.

The present action was brought in May, 1947, by plaintiffs (hereinafter called Marie and Tom) to replevy from defendants Chase Safe Deposit Company and one Stewart O. Day, as administrator of the estate of Frank Muska, deceased, eight bearer certificates for 826 shares of Leader A. G., a Swiss corporation, reposing in a safe-deposit box rented by said Muska. The contents of the box had been undisturbed since Muska's death in 1942 because blocked under Federal executive orders. Jan Bata (hereinafter called Jan) also made claim to said certificates, as a result of which defendant Day interpleaded Jan as a defendant.

Charles Jucker, Wilhelmine Meier and Hans Berger, constituting a Swiss consortium (or partnership), were also interpleaded. Their interest, as will hereinafter appear, is not proprietary and they have neither claimed the shares nor appeared in this action. Nor did defendant Day make any claim to the shares. Defendant Chase Safe Deposit Company was allowed to withdraw from the action. Thus the opposing claimants were Marie and Tom on the one hand and Jan on the other. In such a situation, the action became one in equity wherein the opposing claimants " were brought together to litigate the question which of them had the better right " to the securities in controversy (*Clark* v. *Mosher,* 107 N. Y. 118, 122).

The 826 Leader shares, which are all that is actually involved in this suit, represent, according to the original issue of 2,000 shares, about a 41% interest in the corporation, which is the top holding company in the Bata enterprises. Marie and Tom claim the shares as statutory heirs, or, in civil law, the " universal successors ", of Thomas. Jan's claim has varied. He first asserted an oral contract with Thomas, as to which the courts below have decided adversely to him, and we are of course bound by such findings. He then claims that by virtue of two documents — an alleged written contract dated May 10,

1931, and an alleged will dated May 19, 1931 — as well as the subsequent conduct of plaintiffs, he is now the owner of said shares.

Special Term found in favor of plaintiffs, and the judgment was affirmed by the Appellate Division, the latter court dividing sharply, however. The affirmance was not upon the same theory as adopted in the findings of Special Term, and some of such findings were specifically reversed. Special Term found for plaintiffs upon the theory that Jan had defrauded them into the belief that he was owner of these shares and all other Bata business property, by virtue of a sale of the same to him. The Appellate Division based its affirmance upon the findings of Special Term, except those with respect to plaintiffs' lack of knowledge of certain facts and Jan's fraud committed prior to 1939, a critical year in their relationship. In these respects it made contrary findings and additional findings of its own to which we will refer later. The dissenters in the Appellate Division voted to dismiss the complaint and granted relief to neither party, thus permitting the shares to remain with the Chase Safe Deposit Company.

At the outset, we should point out that the weight of the evidence is not before us, in view of the affirmance of the judgment (*Matter of Kaplan* [*Greenman*], 294 N. Y. 584). Those Special Term findings reversed by the Appellate Division are therefore out of the case, and appellant concedes that the only real question here presented is whether or not there is evidence to sustain the unreversed Special Term findings, the findings made by the Appellate Division and the disposition based thereon.

As already noted, Thomas Bata was an industrial genius. He converted the country town of Zlin into a large industrial center. In the year 1931 the Zlin company in *Czechoslovakia*, of which he was then virtually the sole proprietor, was incorporated as Bata a. s., and later in the same year Leader A. G. was formed as top holding corporation of the *foreign companies*. Nevertheless, he continued to operate all of the companies according to his own concepts and as though he were the individual proprietor thereof.

His philosophy of management was rooted in his early experiences. The business was originally a partnership with his brother, Antonin, who died in 1908, and his sister, Anna; yet, even among them as partners, he had insisted upon the " single head " principle. An additional insight into his attitude toward the business which was his life's work may be found in the " moral testament " which was found with his last will. It was written in 1919, and declares to his successors: " The first condition for the prosperity of our factory and, therefore, also for the preservation of the property invested in it is, that you should not think that the factory is only yours and only for you. \* \* \* as soon as you will think only of yourselves, as soon as you cease to serve with your factory the commonwealth you will become superfluous and you will fall inevitably."

This admonition was undoubtedly written with Thomas's earlier will of 1918 in mind, though it was preserved and kept with the later will. Under the 1918 will, Tom would have succeeded to *50%* of the business, but only after a period during which *control* would be exercised by others, under careful restrictions specifically set forth.

In Thomas Bata's business there were no titles. He was called " Chief " and he had three top assistants — Cipera, Muska and Jan. Cipera was Thomas's chief executive assistant, acting as his second in command. He was also chief fiscal officer. He entered the organization in 1919. Muska was " general financial adviser " to the Bata companies, and was the author of the plan of interlocking companies of which Leader was at the top. He was recognized as Thomas's " attorney in fact and confidential man ". Jan had commenced working for Thomas at the age of fourteen and had a thorough training in the business. He acted as a sort of " trouble shooter ", particularly as to new construction outside of Czechoslovakia.

We have already mentioned the incorporation of Leader A. G. in 1931. That was part of an attempt to put the enterprise in order from an organizational point of view, as well as to protect the increasing foreign interests in the uncertain political setting of the times. It was organized by a Swiss

attorney, Dr. Wettstein, and Leader is a Swiss corporation. One of the dominant purposes behind the organization of Leader was *concealment* of Thomas's ownership of the foreign companies, as was found by the lower courts. Transactions were conducted in such a way that it appeared that Thomas had loaned Wettstein and his partners a sum of money, for which Leader shares had been pledged to Thomas as security. Thomas was protected by rights to purchase the shares for the amount of the " debt ", and by the agreement of Wettstein and the other members of the consortium to carry out his orders in connection with the operation of Leader.

Leader took over majority ownership in the foreign companies, and Thomas retained minority interests therein. The same was done with the shares of companies thereafter organized. Physical possession of 1,996 Leader shares (of which the 826 shares in suit are a part) was taken by Thomas and retained by him, apparently in the custody of Muska. Four qualifying shares were retained by Wettstein and his associates. Subject to the aforesaid arrangement between Thomas and Wettstein, very careful precautions were taken that the management of Leader should have its legal situs in Switzerland.

On July 12, 1932, when Thomas died in the airplane crash, Tom was only seventeen years of age, but had already commenced his apprenticeship in the business and was then occupied at the Swiss factory. His mother was not a businesswoman, but concerned herself with its " social department ". Thomas's relations with his wife and son were apparently of the best, and the trial court so found. The crash occurred early in the morning, almost immediately after the take-off from Zlin. Jan and Cipera rode back together from the scene of the tragedy, and discussed the future of the business. Later that day, the safe in Thomas's office was opened with a key which had been taken from his person. In that safe were found two documents. One of said documents was in an envelope addressed to Jan. After opening the envelope, the enclosed document was signed by those present and then dated by them; it bore its own date of May 10, 1931, was in Thomas's handwriting, and read:

" May 10, 1931

I, the undersigned Tomas Bata, sell to you J. A. Bata, and you purchase from me all shares of Bata a. s., Zlin, and also all shares of the building company ' Zlin ' also all shares of the company 'Tisk ' and also participations of the Libstat establishments. Of foreign companies I sell you the following shares or participations.

[List follows*]

I sell to you further also shares of the domestic companies:

[List follows*]

From these values the landed property of Loucka and Lazy is excluded, also my dwelling house in Zlin.

Except for these named values [four words crossed out] I sell to you all [misspelled word ' my ' crossed out] my property whatsoever even if it is not named here for the amount of Kc. 50,000,000 fifty million Kc. in Czechoslovak currency.

This purchase price you are obligated to pay in cash within one year after taking over the companies and to pay 5% interest per annum.

/Sgd./ Tomas Bata

Further from the sold property the debt which we have against the City of about 4,300,000 is excluded, that is to say, by this amount the purchase price is increased and J. A. Bata is obligated to pay this amount to the City of Zlin.

/Sgd./ Tomas Bata "

The trial court found that Jan appeared surprised when he read the paper. Dr. Foerster, a notary then present, commented to the effect that if the paper was a contract, it should be signed by both parties. Jan then stated that that could be done and he accordingly inscribed the words: " I agree and purchase ", with his signature. On the following day Jan amended his written addendum, placing above it the date, July 13, 1932, and adding: " respectively, I agreed and purchased per oral agreement " (emphasis supplied). The original document was turned over to the notary for filing in his official registry. On July 18th, Jan sent a copy of the document to the tax authorities with a letter in which he erroneously stated that he had received it from Cipera on July 13th. Jan testified

---

* The Leader shares were not mentioned in these lists.

that the paper was in effect a memorandum of an oral agreement of sale which he had made with Thomas. Special Term rejected that testimony and indeed found Jan " wholly unworthy of belief ". The Appellate Division also found that there had been no actual sale, oral or written.

The other document found in the safe was also in the handwriting of Thomas, and was his last will, dated May 19, 1931. In accordance with Czech law, it was opened on July 13th and read to the heirs. At the same time the moral testament and two prior wills were read. The last will read as follows:

" My last will!

Made on the day 19/5 1931.

My property as of today consists of

A claim against J. A. Bata

| | |
|---|---:|
| for all shares in domestic and foreign companies sold | Kc. 50,000,000 |
| My dwelling house in Zlin | 100,000 |
| Landed Estates Loucka and Lazy and Schmegerle | 3,000,000 |
| Claim against the City of Zlin — approximately | 4,300,000 |
| | 57,400,000 |

| | |
|---|---:|
| From this my property I bequeath To my wife Mrs. Marie Bata the landed estates Loucka Lazy Schmegerle - - | 3,100,000 |
| Further in cash - - | Kc. 5,000,000 |
| To my son Tomas Bata his legitimate quota | Kc. 22,000,000 |

with the stipulation that
this property of his shall be
administered by his mother
until he attains 22 years of age.
The proceeds shall be used for
his education and the remainder
shall be deposited for his benefit.

30,100,000

| | |
|---|---:|
| Carried forward | 30,100,000 |
| To my sister Anna Schiebel, I bequeath | 1,500,000 |
| To the City of Zlin the debt with Bata a. s. will be paid by J. A. Bata | 4,300,000 |
| The balance | Kc. 21,500,000 |
| | 57,400,000 |

I give to my fellow-workers

This amount [crossed out: ' is payable '] is
to be paid within 5 years with 5% interest
[crossed out: ' to be paid in cash '] to the
Bata Workers Aid Fund and shall be adminis-
tered in the spirit of the by-laws now in
force.

It is understood that I have drawn up this
last will while in full possession of my
mental powers, clear minded and without
duress and in my own hand.

/Sgd./ Tomas Bata

My previous testament is thereby naturally
deprived of its validity.

/Sgd./ Tomas Bata."

Both lower courts have found that neither the May 10th
writing nor the will constituted a valid, enforcible contract
under Czech law. Although we are bound by such findings, it
is interesting to note that in the settlement of the *estate* inherit-
ance taxes, only its alleged claim against Jan under the May
10th writing was taxed, but these taxes were actually paid
by Bata a. s. and not by Marie and Tom. As to the business
property, Jan claimed ownership pursuant to an oral contract,
which would not have been subject to any tax. The tax offi-

cials rejected this contention, but in effect treated the sale as a written contract, subject to a 2% tax. Upon this basis, a compromise assessment of the business property was made and the 2% tax paid. The assessment was approximately 274,500,000 crowns, or $8,235,000, considerably less than the thirty to forty million dollars found by Special Term to be the worth of the properties at the time of Thomas's death. Had this all been deemed Thomas's estate, the tax would have been enormous, beginning at 20%.

During the year following Thomas's death, the estate went through the civil law equivalent of our probate proceeding. In Czechoslovakia, such a proceeding is nonadversary. Marie and Tom took as statutory heirs, since the will contained only specific bequests. After he reached the age of eighteen, Tom was declared of age. He and Marie thereafter accepted the estate unconditionally, under which form of acceptance the heirs accept full liability for the decedent's obligations, with the result that there need be no further judicial proceedings in relation to the estate, nor a court inventory. When the court delivers the estate to the heirs, they take title to *all* property of the decedent, whether known or *unknown*, subject to legacies and debts, as there is no administrator or executor in their civil law.

Since the written contract of May 10, 1931, was held invalid by the courts below under the Czech law, the estate had no legal claim against Jan. And, although the holographic will was valid under Czech law, yet, since it disposed of a nonexisting asset only, Thomas Bata's estate devolved according to law to his widow and son by way of intestacy. It follows that, subject to the payment of debts and legacies, plaintiffs became the owners of Thomas's estate as a matter of law. The only remaining question is whether the Leader shares in suit were transferred to Jan by any acts of Marie and Tom thereafter.

Section 380 of chapter 3 of Part 2 of the General Civil Code of Czechoslovakia provides: " No ownership can be acquired without a legal basis and without a legal method of acquisition ". The evidence is clear that no transfer or assignment of those shares was made by Marie and Tom to Jan. It is

claimed however that they passed by estoppel as part of a thirty- or forty-million-dollar estate.

Much of the voluminous evidence in this case related to this claim. It will serve no useful purpose to review it in detail. Suffice it to say that there was evidence in the nature of acknowledgments by Marie and Tom tending to support the claim. As to the tax and probate proceedings in the Czech court, however, the courts below have found that they did not result in any binding adjudication as to the validity of the so-called written contract of sale of May 10, 1931, under Czech law. It is also true that Marie and Tom received interest on and installments of their so-called " legacies ", but these came not from Jan personally, but out of their own inherited estate. Moreover, in some cases there is evidence of actual transfers or consents by Marie and Tom to Jan, as, for example, with respect to the British Bata shares, the New York shares, and the antedated agreements and joint wills with respect to the Bata a. s. shares prepared in the early days of the war when Jan asked Marie to return to Czechoslovakia to protect the Zlin factory from confiscation. The status of these securities, however, must be evaluated in their own setting. But there were no such transfers by Marie and Tom of the Leader shares in suit. Everyone concededly recognized Jan as the chief, including Marie and Tom, without question or inquiry until the year 1939, when Jan sought to discharge Tom for a trifling reason.

On the other hand, in 1940, when Jan was on the British blacklist, he told William Jephcott, associated with Canada's Alien Property Custodian, that he had no knowledge of the ultimate beneficial ownership of said Leader shares. He testified that the following year, when he was placed on the American blacklist, and before his departure for Brazil, where he remained throughout the war, he gave the Leader shares in suit to Muska; but Muska made a formal declaration to the Federal Reserve Bank that he had received these shares from Jan to be held subject to instructions from Jucker (who claimed to know nothing about the actual proprietary interest); that Jan told Muska that he had received them from Jucker for safekeeping; and that Jan had also told him that *he (Jan) had no personal proprietary interest therein.* Though he

claimed to own the Bata shares which he transferred to Marie, he agreed to pay her $170,000 upon their return.

We find a hopeless conflict in the evidence with respect to the claimed estoppel. Whether or not upon this record Marie and Tom were estopped is clearly a question of fact. The Appellate Division had the right to determine as it did that the conduct of the parties did not alter the actual devolution of these shares, and that an equitable estoppel had not been established with respect to them. We may not disturb these findings.

We agree with the court below in its affirmance of the trial court's findings and with its reversal of the other stated findings of Special Term. Nor can we say as a matter of law that there is no basis for their finding " That the evidence fails to establish that Jan A. Bata ever had actual or constructive possession of the 826 Leader A. G. shares in suit under claim of right ".

Inasmuch as, under the law of Czechoslovakia, Thomas's property devolved to his widow and son, and the Appellate Division has held that they were not estopped from claiming the Leader shares in suit by their conduct, we have no alternative but to affirm. Upon this record as it comes to us, Marie and Tom " had the better right " to the shares in suit (*Clark* v. *Mosher, supra*). We limit our decision, however, to these shares only.

The judgment of the Appellate Division should be affirmed, with costs.

LEWIS, Ch. J., CONWAY, DESMOND and DYE, JJ., concur with FROESSEL, J.; FULD, J., dissents and votes to reverse and dismiss the complaint for the reasons set forth in the opinion of the two dissenting Appellate Division Justices; VAN VOORHIS, J., taking no part.

Judgment affirmed.