## Bata *v.* Central-Penn National Bank of Philadelphia (et al., Appellant).

356

Argued April 17, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Harold E. Stassen*, with him *James E. Riely, Joseph N. Bongiovanni, Jr., Stassen and Kostos*, and *Stassen and Kephart*, for appellant.

*Lewis H. Van Dusen, Jr.*, with him *Morris R. Brooke, Robert MacCrate, Drinker, Biddle & Reath*, and *Sullivan & Cromwell*, for appellee.

OPINION BY MR. JUSTICE ROBERTS, June 28, 1972:

We have consolidated for consideration appellant Jan T. Bata's appeal from a February 3, 1970, decree of the Philadelphia Common Pleas Court (No. 491 January Term, 1970) and appellant's appeal from a supplementary decree of that same common pleas court entered October 5, 1971 (No. 135 January Term, 1972).

These appeals represent the latest chapter in a twenty-five year dispute over control of the worldwide network of Bata enterprises. This dispute was purportedly terminated by a settlement agreement in 1962, but since 1963 the courts of this Commonwealth have been occupied almost continuously with litigation centering around the settlement agreement. In fact, on two prior

occasions this Court has written full opinions on various aspects of the litigation concerning the settlement agreement. *Bata v. Central-Penn National Bank of Philadelphia*, 433 Pa. 284, 249 A. 2d 767 (1969) [hereinafter cited as *Bata II*]; *Bata v. Central-Penn National Bank of Philadelphia*, 423 Pa. 373, 224 A. 2d 174 (1966), cert. denied, 386 U.S. 1007, 87 S. Ct. 1348 (1967) [hereinafter cited as *Bata I*].

The litigation in the courts of this Commonwealth, as we shall describe in detail, has been generated by appellant's patent violations of the 1962 settlement agreement and protracted by appellant's defiance of the decrees of the courts of this Commonwealth. The decrees from which appellant now appeals awarded appellee compensatory damages for the injuries he suffered as a result of appellant's numerous breaches of the settlement agreement and as a result of appellant's contempt of the decrees of the trial court. The decrees from which appellant now appeals also enjoined appellant from any further violations of the settlement agreement. We find no error in the trial court's decree of February 3, 1970, nor in its supplementary decree of October 5, 1971. Accordingly we affirm.

## I

The factual background of these appeals is a lengthy and complicated one:

### A. The 1962 Settlement Agreement

· "On March 27, 1962, [appellee] Thomas J. Bata and the late Jan A. Bata[1] executed a settlement agreement

---

[1] "The genesis of this controversy actually dates back to the 1932 death of Thomas Bata, a citizen of Czechoslovakia, who was survived by his widow, a son, Thomas J. Bata, the present appellee, and a half-brother, the late Jan A. Bata, the present appellant. During his life Thomas Bata had immensely expanded the family's shoe business into an international enterprise which at the time of his death was worth between $30,000,000 and $45,000,000. Bata

purporting to terminate fifteen years of almost continuous litigation. The agreement provided that the parties would exchange stock certificates and instruments of assignment in various Bata companies, that they would execute comprehensive general releases as well as some 150 special releases, and that they would terminate each of the thirteen lawsuits then pending between them. In addition, [appellee] Thomas J. Bata agreed to pay Jan the sum of $3,400,000 . . . ." *Bata I* at 375-76, 224 A. 2d at 177-78.

Two particular portions of this 1962 settlement agreement should be noted. First, as a part of the comprehensive settlement agreement, appellant agreed

v. Bata, 163 A. 2d 493, 496 (Del. 1960) ; Bata v. Bata, 306 N.Y. 96, 99, 115 N.E. 2d 672, 673 (1953). In order to avoid taxes, the profits from the foreign corporations were accumulated in foreign banks and the records documenting the expansion of Bata's wealth were concealed. For reasons peculiar to Czechoslovakian inheritance law, which would permit his estate to escape heavy taxation, Jan A. Bata, with the consent and knowledge of Thomas J. Bata, assumed title to his half-brother's enterprises under a fictitious prior oral contract of sale. Bata v. Bata, 163 A. 2d 493, 497, 517 (Del. 1960) ; Bata v. Bata, 306 N.Y. 96, 104-07, 115 N.E. 2d 672, 675-77 (1953).

"For several years all went well and the business continued to thrive as a family concern. However, around the outbreak of the Second World War, friction developed between Thomas J. and Jan, which eventually led to conflicting claims of legal ownership. In 1947 the first suit was filed in Switzerland by the present appellee; the parties have been engaged in almost constant litigation since. During this period the courts of Switzerland, the Netherlands, England, New York, and Delaware, among others, have considered various aspects of this controversy. A more complete history of the dispute will be found in the recorded opinions of the New York and Delaware courts, Bata v. Hill, 139 A. 2d 159 (Del. Ch. 1958), aff'd sub nom. Bata v. Bata, 163 A. 2d 493 (Del. 1960), reargument denied, 170 A. 2d 711 (Del.), cert. denied, 366 U.S. 964 (1961) ; Bata v. Chase Safe Deposit Co., 99 N.Y.S. 2d 535 (1950), aff'd sub nom. Bata v. Bata, 279 App. Div. 182, 108 N.Y.S. 2d 659 (1951), aff'd 306 N.Y. 96, 115 N.E. 2d 672 (1953)." *Bata I* at 375-76 n.1, 224 A. 2d at 177-78 n.1.

to cooperate in terminating an action then pending in the Chancery Division of the High Court of Justice of England [hereinafter referred to as the English action] by the entry of an agreed form of "Tomlin Order." This English action involved the conflicting claims of appellant and appellee to certain corporate shares and the accumulated dividends thereon.

Second, by a document dated March 14, 1962, which was incorporated as a part of the comprehensive settlement agreement, appellee and appellant entered into certain agreements concerning N. V. Nederlandesche Schoen-en Lederfabrieden Bata-Best, a Dutch corporation [hereinafter referred to as Bata-Best]. By this document it was agreed, inter alia, that:

"*Article IV*

"The accumulated earned surplus in Bata-Best shall be capitalized and additional shares shall be issued therefor to the holders of shares of Bata-Best in proportion to their share ownership, which is recognized to be 55% in Leader A. G. and 45% in [appellant] Jan A. Bata . . . .[2]

". . . .

"*Article VI*

"The shares of Bata-Best shall be changed to registered shares and these registered shares, in all other respects the same as present bearer shares, shall be is-

---

[2] Appellant's recognition in the March 14, 1962, document that he owned only 45% of the Bata-Best stock and that Leader A. G., a Swiss company, owned 55%, was in fact a concession that appellee owned 55% of Bata-Best. Leader A. G. was controlled by a Swiss partnership, and the Swiss courts had held that this partnership was obligated to act in accordance with the instructions of appellee. In the 1962 settlement agreement, appellant expressly disclaimed any "legal or beneficial interest whatever in Leader A. G. or in its assets," and also waived "any and all interest" in the Swiss partnership.

sued to the holders of the present bearer shares in exchange therefor . . . .

". . . .

"*Article VIII*

"Recognizing the importance of harmonious operations of Bata-Best, [appellant] Jan A. Bata undertakes that he will not commence or take part as a party in any lawsuit concerning any affairs of Bata-Best . . . ."

In order to guarantee the performance of appellant's agreements to cooperate in terminating the English action and to cooperate in registering the shares of Bata-Best, an escrow arrangement was established as a part of the comprehensive settlement agreement. According to this escrow arrangement appellee deposited $500,000 of the $3,400,000 that he had agreed to pay appellant with the Central-Penn National Bank of Philadelphia [hereinafter referred to as Central-Penn]. Appellant deposited certain stock certificates and other documents with the same institution. It was agreed that the $500,000 would be delivered to appellant and the stock certificates and other documents would be delivered to appellee upon the termination of the English action and the registration of the Bata-Best shares.

B. Appellee's 1963 Action for Specific Performance of the Settlement Agreement and the Final Decree of 1965

By mid 1963, despite his undertakings in the comprehensive settlement agreement, appellant had not cooperated in terminating the English action nor had he cooperated in effecting the registration of the Bata-Best shares. Accordingly, on July 16, 1963, appellee filed a complaint in equity alleging that: "Defendant [appellant] Jan A. Bata has wrongfully refused to cooperate in obtaining an order of the High Court of Jus-

tice in London to conclude the litigation pending in that Court and to take the steps which are necessary to be taken by him to permit the registration of the bearer shares of the Dutch Bata Company." Appellee prayed that Central-Penn be directed to deliver the stock certificates and the other documents which it held in escrow to appellee and requested "such other, further and different relief as to the Court may seem just and equitable, together with the costs and disbursements of this action."

Appellant filed an answer alleging in new matter that the settlement agreement was void because it was entered into without consideration and was the result of duress and the force of adverse judgments which were fraudulently obtained in other jurisdictions.

After extensive pleadings, including a reply and a counter reply, appellee moved for judgment on the pleadings. On September 9, 1965, Judge ALESSANDRONI entered judgment on the pleadings in favor of appellee, completely rejecting appellant's[3] claims of lack of consideration, duress, and fraud. The trial court's final decree of October 18, 1965, [hereinafter referred to as the Final Decree] specified: "1. The settlement agreement concluded between the parties on March 27, 1962 is valid and binding. Defendant [appellant] Jan T. Bata, Executor, is ordered specifically a. To cooperate in terminating the action pending in England . . . by consenting to the entry of an order in the form of the attached 'Tomlin Order' in accordance with his instructions heretofore given under date of March 27,

---

[3] The original defendant Jan A. Bata actually died on August 23, 1965, and his son Jan T. Bata was substituted as defendant both individually, as the successor to his father, and as representative of the estate of his deceased father. See *Bata I* at 377-78 n.3, 224 A. 2d at 178 n.3. Throughout this opinion we shall refer to both Jan A. Bata and Jan T. Bata interchangeably as "appellant."

1962 to his English Solicitors . . .; and b. To cooperate in the registration of the outstanding bearer shares of the Dutch Bata [corporation]. . . . in accordance with the agreements dated March 14, 1962 among Thomas J. Bata, Jan A. Bata and Leader, A. G." In addition the Final Decree directed Central-Penn to deliver the stock certificates and the other documents which it held in escrow to appellee, and to retain the $500,000 which it held in escrow "pending the further order of this court, which hereby retains jurisdiction to supervise the carrying out of the provisions of this judgment."

Appellant perfected an appeal to this Court, and on November 15, 1966, we unanimously affirmed the Final Decree. *Bata I.* We noted: "Despite the 1962 settlement agreement, appellant has persisted in advancing his claim to control of the Bata Enterprises. Settlement agreements are designed to forestall not foster litigation, and while like any other contract, there are circumstances under which they may be avoided, these circumstances do not include thinly veiled averments of fraud and duress, whose purpose is to conceal disappointment with the settlement . . . . The orderly administration of justice requires that the protracted litigation which culminated in a total settlement by the parties now be deemed concluded."[4] On April 17, 1967, the United States Supreme Court denied appellant's request for certiorari to review this Court's decision affirming the Final Decree.[5] Yet the "protracted litigation" was far from concluded.

C. Appellant's Contempt of the Final Decree

Despite this Court's affirmance of the Final Decree, appellant persisted in his refusal to cooperate in ter-

---

[4] *Bata I* at 386-87, 224 A. 2d at 182-83.

[5] *Bata v. Central-Penn National Bank of Philadelphia,* 386 U.S. 1007, 87 S. Ct. 1348 (1967).

minating the English action. Accordingly, on June 20, 1967, after a hearing, the trial court issued a supplementary order directing appellant to take all necessary steps to procure the termination of the English action by July 31, 1967, or be fined $100,000 for contempt. Yet by August 10, 1967, appellant had not complied with the direction of the Final Decree and the supplementary order of June 20, 1967. Consequently the trial court, after a hearing, imposed a $100,000 fine upon appellant for his contempt.

By August 29, 1967, appellant had still failed to take the steps necessary for the termination of the English action, and the trial court issued another supplementary order directing appellant to cooperate in terminating the English action. By November 17, 1967, appellant had still failed to comply, and after another hearing the trial court imposed an additional fine of $150,000 upon appellant for his contempt.

As late as March 7, 1968, the trial court found that appellant had still not carried out his obligation to take the steps necessary to terminate the English action. The court noted: "The fines aggregating $250,000 imposed upon defendant . . . are imposed by way of civil contempt in vindication of the plaintiff's established rights. The Court retains jurisdiction of the parties and of the cause to continue supervision of the carrying out of the Final Decree of October 18, 1965, and in the event of defendant's ultimate compliance with the Decree he may apply for remission of the fines imposed against him subject to plaintiff's right of damages including all expenses and attorney fees."

Throughout this period appellant also ignored the second half of the Final Decree by refusing to offer his shares for registration.

Appellant pursued another appeal to this Court from the trial court's orders imposing the fines for con-

tempt. On February 10, 1969, this Court in *Bata II* affirmed the trial court's orders imposing the conditional fines. We described the record below as one that "for literally volumes sets out the disdain with which the decrees and orders of the courts of this Commonwealth were treated."[6] We concluded that in light of "appellant's continuing course of defiance . . . there was little that the court below could do other than to issue its contempt order. There certainly can be no doubt that the order was completely within the court's discretion."[7]

### D. The Trial Court's Order of February 3, 1970

Subsequent to this Court's decision in *Bata II*, appellee filed a motion entitled "Petition for Further Enforcement of the Final Decree of October 18, 1965." In this petition appellee described a series of breaches of the comprehensive settlement agreement which appellant had committed subsequent to September 9, 1965, the date that the trial court entered the adjudication which was the basis of its Final Decree. These breaches were the result of appellant's disregard of his agreements concerning the control and operation of Bata-Best. These agreements were specifically contained in the document dated March 14, 1962, which was included as a part of the comprehensive settlement agreement,[8] and appellee requested that appellant be enjoined from continuing these breaches.

First, appellee described how beginning on October 4, 1965, appellant, acting through his Swiss counsel, made extensive efforts to reopen certain litigation which had been conducted in the Swiss courts and had

---

[6] *Bata II* at 288, 249 A. 2d at 769.

[7] Id. at 289, 249 A. 2d at 769.

[8] See text at pages 3-4, supra.

been concluded prior to the settlement agreement.[9] In this litigation appellant had sought to establish that a mandate or control relationship existed between himself and a Swiss partnership which through its control of Leader A. G. controlled the majority interest in Bata-Best. The Swiss courts denied appellant's claim and instead held that the Swiss partnership was to act in accordance with the instructions of appellee.

By his efforts to reopen the Swiss litigation, appellant contravened his express waiver in the settlement agreement of "any and all interest" in the Swiss partnership. In addition since the purpose of appellant's attempts to reopen the Swiss litigation was to secure control of Bata-Best,[10] appellant was also violating his undertaking in Article VII of the March 14, 1962, document not to "commence . . . any lawsuit concerning any affairs of Bata-Best," and his recognition in Article IV of that same document that he owned only 45% of Bata-Best.[11]

Appellee's petition for further enforcement also described how appellant, acting through his counsel in the Netherlands, asserted in a series of letters commencing on October 5, 1965, that the comprehensive settlement agreement was invalid and that he was the rightful owner of 100% of the shares of Bata-Best.

---

[9] Appellant filed two motions, one in the District Court of Zurich and one in the Superior Court of Zurich, to reopen two actions which had been concluded prior to the settlement agreement. The motion in the District Court was held in abeyance while appellant appealed the Superior Court's denial of his motion to reopen to the Supreme Court of Zurich. Later appellant appealed from the Supreme Court's denial of his petition to reopen to the Swiss Federal Court (Public Law Section). Appellant also filed a separate appeal from the decision of the Superior Court of Zurich to the Swiss Federal Court (Civil Law Section).

[10] See trial court's Opinion Sur Plaintiff's Motion for Summary Judgment, October 5, 1971.

[11] See text at pages 3-4, supra.

These claims were also in direct contradiction of appellant's stipulation in Article IV of the March 14, 1962, agreement, that he owned only 45% of the Bata-Best shares.

Finally, appellee's petition for further enforcement described appellant's vote at the November 29, 1968, general meeting of the shareholders of Bata-Best against the capitalization of the earned surplus of Bata-Best. Appellant held 45% of the shares of Bata-Best, and under the bylaws of that company an increase in the authorized capital could only be effected by a two-thirds vote of the outstanding shares. Appellant's vote was in direct violation of his undertaking in Article IV of the March 14, 1962, agreement to cooperate in effectuating the capitalization of the earned surplus of Bata-Best.

On June 25 through June 27, 1969, the trial court held hearings to receive evidence with respect to appellee's petition for further enforcement. At these same hearings the trial court also received evidence in support of an application for the assessment of damages which appellee had filed. In this application, appellee specified the injuries which he had suffered as a result of appellant's breaches of the settlement agreement and his contempt of the Final Decree.

On February 3, 1970, the trial court issued the decree which is the subject of appellant's appeal at No. 491 January Term, 1970. This decree had three main aspects. First, the decree dismissed appellee's petition for further enforcement. The court noted:

"This court has heard enough testimony to be convinced that this defendant has no genuine intention of ever terminating litigation with the plaintiff in one forum or another in all the courts of the world, and probably never had any such intention even at the moment of executing the March 1962 agreement designed

for that purpose. At the very most, what can be conceded the defendant Bata is a willingness to end the contest only at some point in the distant future when plaintiff delivers up some mythical number of millions in money or property, until which time any solemn agreement or any court's decree is but a way station, or one lost battle to be disregarded as a momentary check, on the path toward final and victorious confrontation . . . .

". . . With the most extreme reluctance, nevertheless, the court is compelled to conclude that the present proceeding cannot be permitted the scope sought for by the plaintiff."

In dismissing appellee's petition for further enforcement the trial court found that appellee's original complaint had alleged only two specific breaches of the 1962 settlement agreement—failure to cooperate in terminating the English litigation and failure to cooperate in registering the Bata-Best shares. However, the court found, appellee's petition for further enforcement alleged additional breaches—revival of the Swiss litigation, claims to ownership of 100% of Bata-Best, and failure to cooperate to capitalize the Bata-Best surplus. Since the original complaint "in neither pleadings nor prayer, had been framed to include those [additional] alleged wrongful acts of defendant Bata within its scope,"[12] the trial court concluded that appellee's request for further enforcement could not be granted.

The second aspect of the trial court's February 3, 1970, decree was its remission of $200,000 of the $250,000 in fines for civil contempt that it had imposed upon appellant. The court noted: "The testimony is quite clear and convincing that defendant did nothing to bring about termination of the litigation in England,

---

[12] See trial court's Opinion Sur Plaintiff's Motion for Summary Judgment, October 5, 1971.

but that he did at length cooperate in effecting registration of the bearer shares of the Dutch Bata company. The court is informed that the effective date of such registration was November 9, 1968. Defendant Bata, on this showing, has complied with a half-portion of the court's order, and has ignored the remainder. The termination of the English litigation was effected by plaintiff alone in an extremely roundabout and burdensome fashion. The fine imposed upon defendant Bata is remitted to the extent of $200,000; the remaining portion of the fine stands." The court directed Central-Penn to pay the unremitted fine of $50,000 from the escrow to the Commonwealth of Pennsylvania.

The third and final aspect of the trial court's February 3, 1970, decree was its award to appellee of $260,-361.85 in compensatory damages. These damages were awarded to compensate appellee for the injuries he suffered between April 17, 1967 (the date that the United States Supreme Court denied certiorari to review this Court's decision in *Bata I* affirming the Final Decree), and June 25, 1969 (the date of the hearings on appellee's application for the assessment of damages), as a result of appellant's failure, in direct contempt of the Final Decree, to cooperate in terminating the English litigation and in registering the Bata-Best shares. These damages were based upon the following expenses and losses incurred by appellee and established at the June 25 to 27, 1969, hearings:

(1) $202,950.26 for services of New York and Philadelphia counsel for enforcement of the Final Decree;

(2) $47,813.55 for services of English counsel for termination of the English litigation without defendant's cooperation;

(3) $9,598.04 in interest on cash dividends wrongfully kept from appellee by the English litigation. The court directed Central-Penn to pay the $260,361.85 in damages to appellee from the escrow.

### E. Appellee's Motion To Amend His Pleadings and the Trial Court's Supplementary Decree of October 5, 1971

In light of the trial court's decree of February 3, 1970, appellee sought permission to amend his complaint. On March 12, 1970, after a hearing, appellee's motion to amend was granted. Appellee amended his complaint to include specific allegations of the three additional breaches of the settlement agreement—revival of the Swiss litigation, claims to ownership of 100% of Bata-Best, and failure to capitalize the Bata-Best surplus—which the trial court had felt unable to remedy on the state of the original pleadings.

After appellee had filed his amended pleadings, and in fact after appellant had filed an answer with new matter and a counterclaim to appellee's amended complaint and appellee had replied, appellant appealed to this Court from the trial court's February 3, 1970, decree. On January 26, 1971, this Court issued an order retaining the appeal but remanding the case to the trial court for an expeditious decision of "all . . . pending issues which had not been disposed of by agreement of the parties or by the lower Court."

In obedience to this Court's order the trial court held a hearing to receive additional testimony in relation to appellee's motion for summary judgment on the amended complaint. This motion had been filed by appellee on May 26, 1970, during the time that appellant's appeal from the trial court's order of February 3, 1970, was pending in this Court.

On October 5, 1971, the trial court issued the supplementary decree which is the subject of appellant's appeal at No. 135 January Term, 1972. This decree granted appellee's motion for summary judgment on his amended complaint and ordered appellant to refrain from attempting to reopen the Swiss litigation,

to refrain from making any claims to ownership of 100% of Bata-Best, and to procure the vote of his 45% holding in Bata-Best in favor of the capitalization of that company's surplus. The supplementary decree also ordered appellant to refrain from asserting the invalidity of the comprehensive settlement agreement in any action in any court of any nation.

In addition, the trial court's October 5, 1971, decree awarded appellee an additional $507,954.86 in damages. The court held: "As the direct result of the defendant Bata's advancing such claims, instituting or reviving litigation, and failure or refusal to perform the terms of the March 27, 1962 comprehensive settlement agreement, plaintiff has been caused to suffer damages, including counsel fees, costs and disbursements, in the amount of $507,954.86." These damages consisted specifically of the following expenses incurred by appellee: (1) fees and disbursements of New York and Philadelphia counsel from January 1, 1963, to April 17, 1967 ($283,737.85)—these fees and disbursements were necessitated by (a) appellee's efforts, from January 1, 1963, to April 17, 1967, to remedy appellant's refusal, in violation of the settlement agreement, to cooperate in terminating the English litigation and in registering the Bata-Best shares, and (b) appellee's efforts, from October 1965 to April 17, 1967, to remedy appellant's attempts to revise the Swiss litigation, claims to 100% ownership of Bata-Best, and refusal to cooperate in capitalization of the Bata-Best surplus; (2) fees for Swiss counsel from October 1965 to December 1968 to defend against appellant's attempts, in violation of the settlement agreement, to reopen the Swiss litigation ($134,567.57); and (3) fees and disbursements of New York and Philadelphia counsel from June 25, 1969, to May 18, 1971, to remedy appellant's attempts to reopen the Swiss litigation, claims to ownership of 100% of

Bata-Best, and refusal to capitalize the Bata-Best surplus, all in violation of the comprehensive settlement agreement ($89,649.44).

Appellant's appeal from this October 5, 1971, decree of the trial court was consolidated with his earlier appeal from the February 3, 1970, decree of the trial court.

## II

We shall first deal with the allegations of error raised by appellant in his appeal, at No. 491 January Term, 1970, from the February 3, 1970, order of the trial court.

Appellant concedes, as he must in light of this Court's previous holdings, that: "It is well settled . . . that the court may, in a proceeding for civil contempt, impose the remedial punishment of a fine payable to an aggrieved litigant as compensation for the special damages he may have sustained by reason of the contumacious conduct of the offender." *Brocker v. Brocker,* 429 Pa. 513, 520, 241 A. 2d 336, 339 (1968) (quoting from *Parker v. United States,* 126 F. 2d 370, 380 (1st Cir. 1942)).[13]

---

[13] It is also well settled that attorneys' fees and disbursements necessitated by another party's civil contempt are among the special damages for which recovery may be had. *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 718, 87 S. Ct. 1404, 1407 (1967) ; *Toledo Scale Co. v. Computing Scale Co.,* 261 U.S. 399, 426-28, 43 S. Ct. 458, 465-66 (1923) ; *Lance v. Plummer,* 353 F. 2d 585, 592 (5th Cir. 1965) ; *In re Federal Facilities Realty Trust,* 227 F. 2d 657, 658 (7th Cir. 1955) ; *West Texas Utilities Co., Inc. v. N.L.R.B.,* 206 F. 2d 442, 448-49 (D.C. Cir. 1953) ; *Backo v. Local 281, United Brotherhood of Carpenters and Joiners of America,* 308 F. Supp. 172 (N.D.N.Y. 1969) ; *Babee-Tenda Corp. v. Scharco Mfg. Co.,* 156 F. Supp. 582, 587 (S.D.N.Y. 1957) ; *Thomas v. Woollen,* Ind.   ,   , 266 N.E. 2d 20, 22 (1971) ; *Grunberg v. Louison,* 343 Mass. 729, 735, 180 N.E. 2d 802, 806 (1962) ; Note, Procedures

However, appellant contends that by our decision in *Bata II* this Court limited appellee's right to recover for the damages caused by appellant's contumacious conduct to recovery of the sum of $50,000. This contention must be rejected.

Only five members of this Court participated in the decision of *Bata II*. Four members voted to affirm the trial court's imposition of $250,000 in conditional fines for contempt, and one Justice, the late Justice COHEN, dissented without an opinion. Of the four Justices who voted to affirm, only two indicated that they would limit appellee's right to recover for the damages caused by appellant's contempt of the Final Decree to $50,000. Certainly Justice COHEN's dissent cannot be regarded as expressing any view on the question of whether appellee's right to recover for damages should be limited. Thus our *Bata II* opinion was in fact an affirmance, by an evenly-divided vote of two to two, of the trial court's holding that there would be no arbitrary limitation on appellee's right to recover for the damages occasioned by appellant's contempt of the Final Decree.

In addition, there is absolutely no authority or reason for imposing such an arbitrary limitation on an injured party's right to recover for the damages caused by the contumacious conduct of another party.[14] Such an arbitrary limitation would enable one litigant, acting in contempt of a court order, to coerce his opponent into unjustified monetary or property concessions by capitalizing on his opponent's desire to avoid legal ex-

---

for Trying Contempts in the Federal Courts, 73 Harv. L. Rev. 353, 354 n.8 (1959) ; see generally, Annotation 55 A.L.R. 2d 979; contra, *Jaikins v. Jaikins*, 12 Mich. App. 115, 122, 162 N.W. 2d 325, 329-30 (1968). Appellant does not dispute this proposition.

[14] Cf. The Constitution of this Commonwealth prohibits the General Assembly from limiting "the amount to be recovered . . . for injuries to persons or property . . . ." Constitution of Pennsylvania, Art. 3, §18.

penses and other damages for which he could not be compensated. In fact, appellant's actions throughout the course of the litigation in the courts of this Commonwealth have apparently been motivated by a strategy of precisely this sort.[15] In light of appellant's deliberate and continuous course of conduct, it would be manifestly unfair to deny appellee the right to recover any more than $50,000 when he has proven that the damages that he suffered as a result of appellant's contumacious conduct were more than five times that amount.

Appellant's next contention is that appellee is not entitled to recover for the costs he incurred in terminating the English action. Appellant bases his contention on the fact that in the 1962 settlement agreement appellee agreed to pay the costs of entering the "Tomlin Order" which was necessary to terminate the English action.

This contention must be rejected. Appellee's agreement to pay the costs of obtaining the "Tomlin Order" was clearly premised upon his justifiable expectation that appellant would abide by his promise to cooperate in terminating the English action. However, as we have noted previously,[16] appellant subbornly refused to cooperate, and the termination of the English litigation was effected by appellee alone in what the trial court accurately characterized as "an extremely roundabout and burdensome fashion." Appellee's agreement to pay the nominal expenses which would have been required to terminate the English litigation with appellant's cooperation cannot be construed as a waiver of his right to damages for the extraordinary expenses which appellee was obliged to incur as a result of appellant's contemptuous refusal to cooperate.

---

[15] See text at pages 10-11, supra.

[16] See text at pages 7-8, supra.

Appellant also contends that the trial court's order of February 3, 1970, erroneously directed that Central-Penn pay $50,000 out of the escrow fund to the Commonwealth of Pennsylvania. More specifically, appellant alleges that this fine constituted a penalty for indirect criminal contempt, and that therefore he was entitled to a jury trial before he could be adjudged to have committed contempt. See Act of June 23, 1931, P. L. 925, §1, 17 P.S. §2047; *Bloom v. Illinois,* 391 U.S. 194, 88 S. Ct. 1477 (1968). Appellant's contention is totally without merit, for he was held in civil, not criminal, contempt.

By its orders of August 10, 1967, and November 17, 1967, the trial court held appellant to be in civil contempt for his failure to carry out the Final Decree.[17] In these orders the court imposed total fines upon appellant of $250,000 in order to obtain appellant's compliance with the terms of the Final Decree. In levying the fines the court noted: "[I]n the event of defendant's [appellant's] ultimate compliance with the decree he may apply for remission of the fines imposed against him subject to plaintiff's [appellee's] right of damages including all expenses and attorneys' fees."

On appeal this Court in *Bata II* held that the fines were "completely within the court's discretion,"[18] and we specifically denied appellant's claim that he was entitled to a jury trial before the fines could be imposed.[19] We pointed out that the purpose of the fines was remedial—to obtain or to coerce appellant's compliance with the Final Decree[20]—rather than punitive, and concluded that the proceedings were therefore ones for civil contempt, not criminal contempt.[21] Of course there is

[17] See text at pages 7-8, supra.

[18] 433 Pa. at 289, 249 A. 2d at 769.

[19] Id. at 289-90, 249 A. 2d at 769.

[20] Id. at 287-88, 249 A. 2d at 768-69.

[21] Id. at 289, 249 A. 2d at 769.

no right to a jury trial in proceedings for civil contempt.[22]

In its order of February 3, 1970, the trial court did not impose any new fines upon appellant. Rather the trial court remitted $200,000 of the $250,000 in fines that it had already imposed upon appellant and held that the remaining $50,000 in fines would stand. As we held in *Bata II*, the $250,000 in fines for civil contempt was properly imposed by the trial court sitting without a jury.[23] We cannot accept appellant's contention that all of those fines must be remitted unless a jury redetermines the trial court's previous adjudication that appellant was in contempt of the Final Decree.

Finally, appellant contends in his appeal from the February 3, 1970, decree that the trial court had no authority to direct that the $50,000 fine and the $260,-000 in damages be paid out of the escrow fund. Appellant argues that a court may not reach an asset of an estate in order to coerce the obedience of the estate's representative to a court order or to compensate a

In *Brocker v. Brocker*, 429 Pa. 513, 521, 241 A. 2d 336, 339 (1968), this Court, quoting from the United States Supreme Court's decision in *United States v. United Mine Workers of America*, 330 U.S. 258, 303-04, 67 S. Ct. 677, 701 (1947), explained the purposes of civil contempt proceedings: "Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." (Emphasis omitted.)

For discussion of the distinction between civil and criminal contempt see *Shillitani v. United States*, 384 U.S. 364, 368-70, 86 S. Ct. 1531, 1534-35 (1966); Note, Procedures for Trying Contempts in the Federal Courts, 73 Harv. L. Rev. 353, 353-54 (1959).

[22] *Cheff v. Schnackenberg*, 384 U.S. 373, 377, 86 S. Ct. 1523, 1524 (1966); *Shillitani v. United States*, 384 U.S. 364, 365, 86 S. Ct. 1531, 1533 (1966).

[23] *Bata II* at 289-90, 249 A. 2d at 769.

party injured by the contumacious conduct of the representative of that estate. Appellant's contention is clearly without merit.

It is a bedrock principle of the law of agency that an agent or servant acting within the general scope of his authority can subject his principal to liability.[24] When, as here, the duly authorized representative of an estate has refused to comply with a court order, we see no reason why the court cannot exact penalties to coerce obedience with its order on either the representative individually or on the estate, or on both the estate and the representative. By the same token, when, as here, the contumacious conduct of the representative of an estate has damaged an individual, we see no reason why that individual cannot look to the assets of the estate as well as to the personal assets of the representative for satisfaction.

In an analogous setting the Restatement 2d, Trusts, in addition to subjecting a trustee to personal liability to third persons on obligations incurred in the administration of a trust,[25] provides in Section 271A: "A person to whom the trustee has incurred a liability in the course of the administration of the trust may be permitted to obtain satisfaction of his claim out of the trust estate if it is equitable to permit him to do so . . . ."

The official Comment to the above-quoted section of the Restatement describes Section 271A as embodying the "modern trend." The Comment explains:

"It has gradually become established that a person to whom the trustee has incurred a liability in the course of the administration of the trust may reach the trust estate for satisfaction of his claim . . . .

---

[24] See, e.g., Restatement 2d, Agency, §§140-267.

[25] Restatement 2d, Trusts, §261.

"It is coming to be recognized that just as an agent or servant acting within the general scope of his authority can subject his principal to liability, so a trustee acting within the general scope of his authority can subject the trust estate, although not the beneficiaries personally, to liability . . . .

"Under this principle the creditor is given a direct claim against the trust estate, enforceable by an action against the trustee in his representative capacity. It is immaterial whether the trustee has committed a breach of trust as a result of which he is indebted to the trust estate."[26]

In another analogous situation, the courts of this Commonwealth and of other jurisdictions have on numerous occasions imposed fines upon the assets of corporations or unions for the contumacious conduct of corporate agents or union members.[27]

Finally, it should be noted that the escrow fund was established for the express purpose of guaranteeing the performance of appellant's contractual agreements to cooperate in terminating the English action and in registering the Bata-Best bearer shares.[28] Since appellant's contempt consisted of a refusal to carry out court orders to perform the very agreements that the

---

[26] See III Scott, The Law of Trusts §§266-271A.3 (3d ed. 1967).

[27] See, e.g., *Milk Control Commission v. McAllister Dairy Farms*, 384 Pa. 459, 121 A. 2d 144 (1956) ; *Scranton v. Peoples Coal Co.*, 274 Pa. 63, 117 Atl. 673 (1922) ; *United States v. United Mine Workers of America*, 330 U.S. 258, 67 S. Ct. 677 (1947) ; *In re Holland Furnace Co.*, 341 F. 2d 548 (7th Cir. 1965) ; *Singer Manufacturing Co. v. Sun Vacuum Stores, Inc.*, 192 F. Supp. 738 (D.N.J. 1961) ; *United States v. Brotherhood of Railroad Trainmen*, 95 F. Supp. 1019 (D.D.C. 1951) ; *State v. Local Union 5760, United Steelworkers of America*, 172 Ohio St. 75, 173 N.E. 2d 331 (1961) ; see *Butler County v. Pittsburgh, Harmony, Butler & Newcastle Ry. Co.*, 298 Pa. 347, 351, 148 Atl. 504, 505-06 (1929) ; see generally 17 Am. Jur. 2d Contempt §12 ; 17 C.J.S. Contempt §34.

[28] See text at page 4, supra.

escrow fund was designed to secure, we believe that it was not only proper but particularly appropriate in this case for the trial court to assess the fine and damages upon the escrow fund.

### III

The essence of appellant's argument in his appeal at No. 135 January Term, 1972 is that the trial court erred when it permitted appellee to amend his complaint and thereby provide the basis for the additional relief which the court granted in its October 5, 1971, supplementary decree.[29] We believe that the trial court's allowance of the amendment was entirely proper.

This Court has frequently held that amendments to pleadings " 'should be liberally granted at any stage of the proceedings.' " *Wilson v. Howard Johnson Restaurant*, 421 Pa. 455, 460, 219 A. 2d 676, 679 (1966) (quoting from *Schaffer v. Larzelere*, 410 Pa. 402, 407, 189 A. 2d 267, 270 (1963)).[30] This liberality is in accord

---

[29] Although appellant does not question the propriety of the trial court's award of damages to compensate appellee for the counsel fees and disbursements necessitated by appellant's numerous breaches of the settlement agreement, we note that the United States Supreme Court has held that "allowance of counsel fees and other expenses entailed by litigation . . . 'is part of the historic equity jurisdiction of the federal courts.' " *Vaughan v. Atkinson*, 369 U.S. 527, 530, 82 S. Ct. 997, 999 (1962) (quoting from *Sprague v. Ticonic National Bank*, 307 U.S. 161, 164, 59 S. Ct. 777, 779 (1939) (FRANKFURTER, J.)). The Supreme Court has indicated that counsel fees and other expenses entailed by litigation are to be awarded "when overriding considerations of justice . . . compel such a result." *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718, 87 S. Ct. 1404, 1407 (1967). This is certainly such a case.

[30] See *Kilian v. Allegheny County Distributors*, 409 Pa. 344, 347, 185 A. 2d 517, 519 (1962) ; *Esso Standard Oil Co. v. Taylor*, 399 Pa. 324, 330, 159 A. 2d 692, 695-96 (1960) ; *Miners Savings Bank v. Naylor*, 342 Pa. 273, 279, 20 A. 2d 287, 291 (1941).

with the general objective of our procedural rules. Rule 126 of the Pennsylvania Rules of Civil Procedure provides: "The rules shall be liberally construed to secure the just, speedy and inexpensive determination of every action or proceeding to which they are applicable. The court at every stage of any such action or proceeding may disregard any error or defect of procedure which does not affect the substantial rights of the parties."

Despite our liberal policy of allowing amendments to pleadings, an amendment will not be permitted if it would result in undue prejudice to the pleader's opponent.[31] Professor Fleming James, Jr., of Yale Law School has given an accurate and succinct description of the concept of prejudice in this context: "All amendments have this in common: they are offered *later in time* than the pleading which they seek to amend. If the amendment contains allegations which would have been allowed inclusion in the original pleading (the usual case), then the question of prejudice is presented by the *time* at which it is offered rather than by the substance of what is offered. The possible prejudice, in other words, must stem from the fact that the new allegations are offered *late* rather than in the original pleading, and not from the fact that the opponent may lose his case on the merits if the pleading is allowed . . . ."[32]

Nor will an amendment be permitted which would undermine the valid policies embodied in the statutes of limitation. Thus while Rule 1033 provides that an amended pleading "may aver transactions or occur-

---

[31] *Wilson v. Howard Johnson Restaurant*, 421 Pa. 455, 460, 219 A. 2d 676, 679 (1966); *Schaffer v. Larzelere*, 410 Pa. 402, 407, 189 A. 2d 267, 270 (1963); *Kilian v. Allegheny County Distributors*, 409 Pa. 344, 347, 185 A. 2d 517, 519 (1962); *Esso Standard Oil Co. v. Taylor*, 399 Pa. 324, 330, 159 A. 2d 692, 695-96 (1960); *Miners Savings Bank v. Naylor*, 342 Pa. 273, 279, 20 A. 2d 287, 291 (1941).

[32] Fleming James, Jr., Civil Procedure 158 (1965).

rences which have happened before or after the filing of the original pleading, even though they give rise to a new cause of action," this Court has consistently held that an amendment introducing a new cause of action will not be permitted after the statute of limitations on the new cause of action has expired.[33]

Applying these principles to the instant case, it is clear that appellee's amendment was properly allowed. Appellant suffered no prejudice as a result of appellee's amendment—he had ample time to prepare to refute the allegations which appellant introduced by way of amendment. In addition, allowance of appellee's amendment in no way undermined any of the policies sought to be advanced by the statute of limitations. Each of the three additional breaches of the settlement agreement introduced by appellee's amendment to his complaint occurred after October 1, 1965,[34] and thus were well within the six year statute of limitations period for contract actions[35] when appellee's amended complaint was filed on March 16, 1970.

Moreover, we believe that the interests of judicial efficiency and economy clearly called for the trial court to permit appellee's amendment. Prior to his amendment, appellee had already introduced an immense quantity of evidence concerning the three additional breaches in his petition for further enforcement of the Final Decree[36] and at the June 1969 hearings on that

---

[33] *Wilson v. Howard Johnson Restaurant*, 421 Pa. 455, 461, 219 A. 2d 676, 679 (1966) ; *Schaffer v. Larzelere*, 410 Pa. 402, 407, 189 A. 2d 267, 270 (1963) ; *Arner v. Sokol*, 373 Pa. 587, 592, 96 A. 2d 854, 856 (1953) ; *Shenandoah Borough v. Philadelphia*, 367 Pa. 180, 192, 79 A. 2d 433, 438 (1951).

[34] See text at pages 8-10, supra.

[35] Act of March 27, 1713, 1 Sm. L. 76, §1, 12 P.S. §31. See *Dixon Estate*, 426 Pa. 561, 562, 233 A. 2d 242, 244 (1967) ; 22 P.L.E. Limitation of Actions, §§24, 54.

[36] See text at pages 8-10, supra.

petition. For the trial court to have refused appellee's amendment and required him to bring a separate action to remedy the three additional breaches would have occasioned a serious and unnecessary expenditure of the time and resources of the courts of this Commonwealth.

The trial court's decree of February 3, 1970, and the supplementary decree of October 5, 1971 are affirmed. Appellant to bear costs.

Mr. Justice MANDERINO concurs in the result.

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE EAGEN:

I concur in the affirmance of the trial court's decree of February 3, 1970 (appeal No. 491 January Term, 1970). However, I would reverse the supplementary decree of the trial court entered on October 5, 1971, and, hence, I dissent from the majority's ruling in Appeal No. 135 January Term, 1972.