466 F.2d 722
 DIAMOND SHAMROCK CORPORATION, a Delaware corporation, and
Fireman's Mutual Insurance Company, a Rhode Island
corporation, Plaintiffs-Appellees,
v.
LUMBERMENS MUTUAL CASUALTY COMPANY, an Illinois corporation,
Defendant-Appellant.
 No. 71-1594.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 2, 1972.
Decided Aug. 29, 1972.
Rehearing Denied Sept. 16, 1972.
 
 Donald N. Clausen, Jacob T. Pincus, Chicago, Ill., for defendant-appellant.
 Lawrence Zelle, Minneapolis, Minn., Robert A. Downing, Chicago, Ill., for plaintiffs-appellees.
 Before SWYGERT, Chief Judge, and STEVENS and SPRECHER, Circuit Judges.
 SPRECHER, Circuit Judge.
 
 
 1
 This appeal is from a judgment in plaintiffs' favor in an action for declaratory judgment on an insurance policy covering loss caused by accident at plaintiff Diamond Shamrock Corporation's Deer Park, Texas, plant. We affirm in part and reverse in part.
 
 
 2
 On April 30, 1967, an explosion and fire damaged a compressor and surrounding area at Diamond's Deer Park plant. Diamond was covered by two insurance policies, one issued by co-plaintiff appellee Fireman's Mutual Insurance Company, and a second issued by Lumbermens Mutual Casualty Company, the defendant. The Fireman's policy insured Diamond against loss caused by fire. The Lumbermens' policy covered loss caused by "accident," but expressly excluded coverage for any loss caused by fire. Following the explosion, Fireman's acknowledged liability for certain portions of the damage, but denied coverage for damage caused by the initial explosion because it had not been "directly or indirectly" caused by fire. Lumbermens denied coverage under its accident policy on the basis of its belief that the explosion had been caused by fire.
 
 
 3
 Fireman's joined Diamond in an action for declaratory judgment against Lumbermens. Jurisdiction was based on diversity of citizenship. 28 U.S.C. Sec. 2201. The trial court held that defendant Lumbermens was liable to Diamond under its policy and found that Diamond was entitled to $2,030,949, together with certain continuing interest and attorney's fees. Lumbermens' appeal alleges error on both the liability and damage issues, as well as in the award of attorney's fees.
 
 I.
 
 4
 Lumbermens argues that the district court erred in finding liability under the contract because the initial explosion in the compressor was caused by an "independent hostile fire." Under Lumbermens' theory, the explosion resulted from the presence of a diffusion flame in the compressor which ignited the combustible raw gas mixture. In order for the explosion to have occurred in the manner postulated a number of factors would have had to have been present. A review of the evidence indicates that the district court was correct in deciding that several critical elements were missing, and that the explosion could thus not have been caused by "fire."
 
 
 5
 In the first place, defendant's theory is dependent upon the existence of pressure in the compressor at the time of the ignition of the gas mix of at least 105 psia. However, data collected during a previous shoutdown indicates that the pressure in the compressor at the critical moment was substantially less than this figure. Lumbermens' theory of a fire was also predicated upon the assumption that the explosion occurred no more than 25 to 30 seconds following the action of Diamond's head operator in pushing a button which shut down the compressor by cutting off all power thereto. The evidence shows that the explosion did not occur in less than 45 to 60 seconds after the button was pushed. The record also indicates that the percentage of oxygen in the compressor at that time was between 10 and 15 per cent, considerably less than the 22 per cent required for an explosion in the manner theorized by defendants' expert. Finally, Lumbermens' theory depended upon the coincidence of having the weakest point of the compressor located at the same point as certain cast iron having the lowest tensile strength. The district court found that the probability of such an occurrence was exceptionally remote and nothing in the record indicates that a contrary finding should have been made.
 
 
 6
 The district judge accepted plaintiffs' theory of the explosion, finding that the cause was the ignition of combustible gas by heat generated by the rubbing of a labyrinth seal on the adjoining metal. Under this theory, the explosion originated near the inlet end of the high pressure casing of the compressor and proceeded for some distance as a deflagration-type explosion before transition to a detonation-type explosion. Plaintiffs' expert arrived at his opinion only after a two-year study of the problem which included inspection of the compressor area and the damaged section of the compressor. In contrast, none of Lumbermens' experts ever visited the Deer Park plant or examined the damaged compressor. Although tests which would have ascertained the validity of defendant's theory were scheduled at Atlantic Research Corporation, none were ever conducted. In view of the extreme improbability of defendant's only theory of a fire occurring as they have assumed and the substantial evidence supporting plaintiffs' theory of the explosion, we affirm the district court's findings on liability.[1]
 
 II.
 
 7
 Lumbermens challenges the legal sufficiency of the evidence supporting the judgment awarding Diamond $442,579 for direct property damage and the admissibility of certain evidence on this issue.
 
 
 8
 We find no merit in Lumbermens' argument that Diamond failed to offer legally sufficient proof on the amount of damage attributable solely to the explosion of the compressor. Defendant insists that Diamond was required to prove by detailed evidence exactly what objects were damaged, whether they had to be replaced, and the reasonableness of the amounts expended for repair or replacement. This argument was answered by the Sixth Circuit in Welders Supply, Inc. v. American Employee's Insurance Co., 358 F.2d 593, 602 (6th Cir. 1966), in which the court noted: "Were we to adopt the defendant's view of proof required by this policy in this sort of industry, we would render the policy utterly useless to a purchaser because of the impossibility of such proofs." Cf. Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562, 51 S.Ct. 248, 75 L.Ed. 544 (1931).
 
 
 9
 In this case, Lumbermens agreed to the method used by Diamond to allocate the damage and, although it had access to all of the information pertinent to the allocations, objected to only one of Diamond's allocations.[2] In fact, at trial Lumbermens failed to offer any evidence at all on this question. On the basis of this record, we can only concur in the trial judge's finding that the method of allocation was "the only reasonable and fair one . . . since items in the area of the K-1 compressor which appeared to be damaged by fire were initially damaged by the compressor explosion."
 
 
 10
 Lumbermens' argument that Diamond's proof of the amounts actually paid for repairs and replacement was legally insufficient is equally without merit. Lumbermens' theory seems to be that the "proper measure of damages for the destruction of personal property is its value or reasonable worth at the time and place of such destruction." That formulation ignores the contract under which this action was brought. The policy explicitly provided that Lumbermens would be liable for either repair or replacement of damaged property, whichever cost less. Diamond's evidence showed that it had either repaired or replaced all of the property damaged by this compressor explosion. Absent any proof by Lumbermens that Diamond opted for the more expensive alternative, Diamond's evidence must be used as the proper measure of damage under the policy. Sitnick v. Glazer, 11 Ill.App.2d 462, 467-468, 138 N.E.2d 84, 88-89 (1956); Garford Motor Truck Co. v. Miller's National Insurance Co., 230 Ill. App. 622, 624-625 (1923). Here, Lumbermens offered no such proof.
 
 
 11
 Lumbermens objects to Diamond's use of summaries compiled from its business records on the basis of hearsay and authenticity. With respect to the hearsay objection, we find that the evidence falls squarely within the business record exception to the hearsay rule as set forth in the Federal Business Records Act.[3] That statute provides for the admissibility of records "made in the regular course of any business" even if the party who made the entry lacked personal knowledge of the facts recorded. In the instant case, the actual records were not offered into evidence. Instead, summaries of those records which were prepared from ledger entries covering the company's expenditures for repair of the acetylene plant were used. The use of such summaries where documents and records are voluminous is well established. See Wigmore, Evidence Sec. 1230 (3rd ed. 1940):
 
 
 12
 Where a fact could be ascertained only by the inspection of a large number of documents made up of very numerous detailed statements-as, the net balance resulting from a year's vouchers of a treasurer or a year's accounts in a bank-ledger-it is obvious that it would often be practically out of the question to . . . [require] the production of the entire mass of documents and entries to be perused by the jury or read aloud to them. The convenience of trials demands that other evidence be allowed to be offered, in the shape of the testimony of a competent witness who has perused the entire mass and will state summarily the net result. Such a practice is well established to be proper.
 
 
 13
 The summaries in question were prepared by Donald Purdy, Diamond's insurance director, who testified that in preparing the summaries from official ledger entries, he inspected the subaccount entries and material relevant to those entries to insure that the summaries accurately reflected the information contained in Diamond's books and accounting records. Purdy was, therefore, competent to authenticate the summaries. It is not necessary, as Lumbermens argues, that every person who assisted in the preparation of the original records or the summaries be brought to the witness stand. United States v. Mortimer, 118 F.2d 266, 269-270 (2d Cir. 1941).
 
 
 14
 Lumbermens also argues that the summaries in question do not fall within the business record exception to the hearsay rule because they were records prepared for use in litigation and not records kept in the ordinary course of Diamond's business. Lumbermens relies on Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943). In Palmer, the defendant railroad sought to introduce as a business record an exculpatory statement made by its engineer to another railroad employee. The court rejected this statement on the ground that it did not qualify as a record kept in the ordinary course of the railroad's business. The summaries challenged here, however, are significantly distinguishable. We are not dealing with accident reports which have as their only purpose the protection of a party in subsequent litigation; rather we deal with regular accounting records which record Diamond's day-to-day business expenditures. These records were not kept in anticipation of the present litigation. See Pollard v. United States, 441 F.2d 566 (7th Cir. 1971). The insurance policies themselves required Diamond to keep records of all losses and report them to the insurer. Lumbermens had ample opportunity to verify the authenticity and accuracy of the underlying data. The summaries which were properly prepared from these records and authenticated at trial were, therefore, properly admitted by the district court.
 
 III.
 
 15
 Lumbermens vigorously attacks the legal sufficiency of the evidence upon which the trial judge awarded Diamond $1,157,100 in damages under the Business Interruption Endorsement to the policy. This loss, like the property damage claim, was compiled from Diamond's books and reduced to summaries for introduction into evidence by Diamond accountants and Mr. Purdy. The books and records from which these summaries were made were at all times available for inspection by Lumbermens and, in fact, Lumbermens had a private accounting firm audit these books and records to determine the extent of its exposure under this clause of the policy. For some reason, Lumbermens chose not to introduce the results of that audit into evidence.
 
 
 16
 Lumbermens argues that the policy covered only "loss of earnings" and that the summaries proved no such loss. The policy provided coverage for business interruption loss by protecting against:
 
 
 17
 1. Loss of net profit, the difference between the prospective sales value and the estimated cost value of the business prevented;
 
 
 18
 2. That part of fixed charges and expenses (salaries and officers and employees under contract and other employees, etc.) which the business did not earn because of an accident, but which the business would have earned had the accident not occurred; also manufacturing, selling and administrative expenses contributing to the overhead expenses of the assured;
 
 
 19
 3. Expenses necessarily incurred to reduce or avert prevention of business.
 
 
 20
 It seems clear that the language of the policy does not restrict recovery to lost earnings. Defendant relies on Quality Molding Co. v. American National Fire Insurance Co., 272 F.2d 779, 780 (7th Cir. 1959), in which the court, construing the language of a fire insurance policy, stated that the purpose of business interruption insurance was to protect the insured against loss of earnings. However, the court in that case also noted that the insured could recover for expenses incurred in reduction of loss and for certain other charges and expenses. That decision does not, therefore, restrict the scope of recovery in this case.
 
 
 21
 Diamond's summary exhibits, together with the testimony of Diamond's accountant, Mr. Zetts, provide a detailed analysis of the method by which the total business loss figures were reached. Those exhibits were sufficient to establish a prima facie case of loss in the amount claimed. At that point it became incumbent upon Lumbermens to prove that the losses claimed were excessive or unreasonable. See New York, C. & St. L.R.R. v. American Transit Lines, 408 Ill. 336, 97 N.E.2d 264 (1951); Sitnick v. Glazer, 11 Ill.App.2d 462, 138 N. E.2d 84 (1956). Armed with an independent audit of the business loss claimed by Diamond, Lumbermens was in a position to attack any discrepancy between the claim and the policy coverage. Instead of introducing the private audit or challenging the accuracy of Diamond's summary exhibits, Lumbermens remained silent. Having done so, it cannot now be heard to complain of inaccuracies it failed to challenge or refute below. Diamond's proof on this issue was legally sufficient both to demonstrate the loss and to show coverage under the policy.
 
 
 22
 Lumbermens insists that it was error for the trial court to admit the summaries used to support the business interruption loss. As the contention is virtually the same as the hearsay and authenticity arguments used to attack the property damage summaries, we shall treat it briefly. With respect to the business loss summaries, the case for admissibility is even stronger. Here the accountant who actually made the original entries on the corporate records and assisted in the preparation of the summaries testified from his personal knowledge as to their accuracy and authenticity. In addition, Mr. Purdy, under whose supervision the summaries were made, testified as to the method of compilation. That places the business interruption summaries clearly within the ambit of our decision in In re Shelley Furniture, Inc., 283 F.2d 540 (7th Cir. 1960). There we held that an accountant familiar with voluminous business records who made summaries of those records for use at trial was competent to authenticate those summaries.
 
 IV.
 
 23
 The trial judge awarded Diamond $406,270 in interest expense allegedly paid by Diamond for short term loans for operating capital. The award was to continue accumulating at the rate of $198.77 per day. The judge below concluded that the business interruption and lost profits clause covered this expenditure because the additional borrowing which these loans, totaling almost $2,000,000, represented was necessitated by the explosion. The interest award was based on the district court's finding that, if the explosion had not occurred, these additional borrowing expenses would not have been incurred. The monies necessarily used to repair or replace property damage and the business interruption expenses and lost profits would have been available to reduce Diamond's borrowing requirements, thereby reducing its expenses and increasing its profits.
 
 
 24
 Our reading of the business interruption endorsement clause leads us to believe that the policy protected Diamond against such loss. The coverage included not only the loss of net profits, but also the "fixed charges and expenses . . . which the business did not earn" because of the accident, including manufacturing, selling and business administrative expenses, and "any other items contributing to the overhead expenses of the assured." The interest costs incurred as a result of the compressor explosion are overhead expenses and, as such, are part of the damage recoverable under the policy.
 
 
 25
 Lumbermens' claim that the admission of Exhibit 14-26, a summary exhibit which proved Diamond's interest expenditure, was legally insufficient proof without the introduction of supporting documents, is answered by our decision in In re Shelley Furniture, Inc., supra, 283 F.2d at 543, in which we stated: "Where a witness who is familiar with the contents of voluminous records testified to the general result of examination by a summary of their contents, the entire mass of the records themselves need not be admitted into evidence, where the records are available to the opposing party for inspection if desired, and for use in cross-examination." See also Board of County Commissioners v. William J. Howard, Inc., 230 F.2d 561, 564-565 (10th Cir. 1956). Lumbermens did not object at the trial to the admission of Exhibit 14-26 on any ground except that the expense was not covered by the policy. Lumbermens' counsel did not cross-examine Mr. Purdy on the exhibit, nor did he claim that Lumbermens had not been furnished the records of which Exhibit 14-26 was a summary. While Exhibit 14-26 is not a model of completeness or clarity, we believe under the circumstances it was sufficient to prove the amount of Diamond's expenditure.
 
 V.
 
 26
 The district court also permitted Diamond to recover as a part of its business loss the $25,000 which was deductible from Fireman's coverage for damage caused by fire. The district court found this to be "an additional direct loss caused by the explosion of the compressor." We believe that coverage should not have been extended to this expense since it was conceded that the damages represented by the $25,000 were caused by fire, and were thus recoverable only under the Fireman's insurance policy.
 
 VI.
 
 27
 The final element of the district court's damage award was the imposition of the reasonable attorney's fees incurred by Diamond in pursuing this litigation. The district court gave no basis for its decision and, under the circumstances, we do not feel the award of attorney's fees was justified.
 
 
 28
 "[I]t has long been held that a federal court may award counsel fees to a successful plaintiff where a defense has been maintained 'in bad faith, vexatiously, wantonly, or for oppressive reasons.' " Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 402 n. 4, 88 S. Ct. 964, 966, 19 L.Ed.2d 1263 (1968). Illinois also provides for the allowance of attorney's fees where insurance companies vexatiously and unreasonably refuse to honor just claims by their insured. Ill.Rev.Stat. ch. 73, Sec. 767.
 
 
 29
 The mere fact that a defendant is unsuccessful will not justify the award of attorney's fees. Zak v. Fidelity-Phenix Ins. Co., 34 Ill.2d 438, 216 N.E.2d 113 (1966). In this case, the question of liability, while ultimately decided in favor of Diamond, took five weeks and 3,000 pages of testimony to resolve. Numerous expert witnesses testified for both sides and hundreds of exhibits were introduced into evidence. Although neither the length of trial nor number of experts can ever conclusively establish that the defense of a suit was not frivolous or in bad faith, we feel that the difficulty in establishing the cause of the underlying dispute in this case, in the absence of trial court findings on the issue of vexatious, unreasonable conduct, should be determinative.
 
 
 30
 The judgment of the district court is affirmed except for the award of $25,000 deductible under Fireman's insurance policy and the allowance of attorney's fees.
 
 
 
 [1]
 Since we have decided that Diamond adequately established the cause of the initial explosion, we need not reach the merits of Lumbermens' contention that the trial in this case was governed by Texas law, under which the insured bears the burden of proving that he does not fall within a specific policy exclusion. We note, however, that the Texas rule, set forth in article 21.42 of the Texas Insurance Code, V.A.T.S., applies only to a citizen or "inhabitant" of the state of Texas. Diamond is a Delaware corporation with its principal place of business in Cleveland, Ohio. Thus, even under the Texas interpretation of "inhabitant," Diamond is not within the ambit of article 21.42's coverage, since a corporation is defined as an "inhabitant" of the state in which it is incorporated or has its principal place of business. Texas Pacific Ry. v.Mangum, 68 Tex. 342, 4 S.W. 617 (1887); Mergenthaler Linotype v. Hermann, 211 S.W.2d 633 (Tex.Civ.App. 1948)
 
 
 [2]
 An accounting system instituted by Diamond for allocation of repair costs between the compressor explosion and "G-2" fire was agreed to by both insurance companies. These allocations were made by Diamond, but agents from Lumbermens and Fireman's had complete access to Diamond's books to check the costs of repair and their allocation. The only objection raised by Lumbermens was to the inclusion of $100,280, the cost of a new casing for the low stage of the compressor. Lumbermens' objection to this inclusion is apparently based on the fact that the casing had been repaired and "accepted" by Diamond. However, as the evidence clearly indicates, the repair was never intended as more than a temporary measure, for emergency use only, which would not have been safe for operations on a permanent basis. Furthermore, Lumbermens was aware that a new casing had been ordered and that the repairs were intended to be temporary in nature, and did not object to the propriety of Diamond's actions at the time
 
 
 [3]
 The Federal Business Records Act, 28 U.S.C. Sec. 1732, provides in subsection (a):
 In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence or event or within a reasonable time thereafter.
 All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.