**MONTGOMERY WARD & CO., INC.**

v.

**PACIFIC INDEMNITY COMPANY,**
**Appellant.**

No. 76–2092.

United States Court of Appeals,
Third Circuit.

Submitted under Third Circuit Rule
12(6) March 28, 1977.

Decided June 7, 1977.

John W. Jordan IV, Thomson, Rhodes & Grigsby, Pittsburgh, Pa., for appellant.

Stanley V. Ostrow, and G. Ashley Woolridge, Kaplan, Finkel, Lefkowitz, Roth & Ostrow, Pittsburgh, Pa., for appellee.

Before VAN DUSEN, GIBBONS and GARTH, Circuit Judges.

## OPINION OF THE COURT

VAN DUSEN, Circuit Judge.

This appeal is from an award of attorney's fees incurred as a result of bringing a declaratory judgment action in a diversity case.[1] Although the district court recognized that state law will normally govern the award of attorney's fees in diversity cases, the court found that, irrespective of state law and as part of the historic equity jurisdiction of the federal courts, the court could award attorneys' fees where bad faith or its equivalent is found to exist. Although our reasoning differs from that of the district court, we affirm its grant of a motion for summary judgment and award of fees.

### I.

Montgomery Ward (Montgomery) commenced this declaratory judgment action on December 5, 1974, to obtain a determination that Pacific Indemnity Company (Pacific) was obligated to defend and indemnify it[2] in a products liability diversity action which was then pending in the United States District Court for the Western District of Pennsylvania. Montgomery was named as "a person insured" on the "vendors endorsement" to the policy Pacific had issued to Royal Industries, the manufacturer and also a defendant in the tort action.[3]

"I. COVERAGE A—BODILY INJURY LIABILITY
COVERAGE B—PROPERTY DAMAGE LIABILITY
The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of
A. bodily injury or
B. property damage
to which this insurance applies, caused by an occurrence, as defined herein, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient . . . ."

The endorsement contained the following exclusion:
"The insurance with respect to the vendor does not apply to:
(a) Any express warranty, or any distribution or sale for a purpose, unauthorized by the named insured;

---

1. This court has jurisdiction under 28 U.S.C. § 1291. Both here and in the district court, Pacific contended that the case should be dismissed because less than $10,000. was in controversy. As the factual outline below reveals, Montgomery Ward's potential liability at the time suit was brought was substantially in excess of the jurisdictional amount and all of the claims asserted in the declaratory judgment action were substantially interrelated. The fact of the subsequent settlement, described below, and the reduction of Montgomery's claim to a liquidated amount below $10,000. did not deprive the district court of its 28 U.S.C. § 1332(a) jurisdiction. See *Gray v. Occidental Life Insurance Company of California*, 387 F.2d 935, 937 (3d Cir. 1968); *Globe Indemnity Co. v. St. Paul Fire & Marine Insurance Co.*, 369 F.2d 102 (3d Cir. 1966); 1 Moore's Federal Practice ¶¶ 0.91[3], 0.92[1] (2d ed. 1975); 6A Moore's Federal Practice ¶ 57.23.

2. We explicitly approved such a procedure in *Globe Indemnity Company v. St. Paul Fire & Marine Insurance Co.*, 369 F.2d 102 (3d Cir. 1966).

3. Another pertinent section of the contract provided:

The relief sought included prayers that the district court enter a declaratory judgment construing the pertinent provisions of the Vendor Insurance Endorsement issued by Pacific and designating Montgomery as a named insured, determine the respective liabilities of Pacific and Montgomery under the endorsement, determine that Montgomery should be afforded coverage under the endorsement in regard to the personal injury action against Montgomery pending in the same court, and order that Montgomery be entitled to its private counsel fees and expenses in the personal injury action as well as in the declaratory judgment action.

On June 24, 1975, the products liability claim was settled.[4] Pacific paid $50,000. of the settlement and reimbursed Montgomery for its costs and counsel's fees incurred in

> (b) Bodily injury or property damage arising out of:
>
> (i) Any act of the vendor which changes the condition of the Products;
>
> (ii) Any failure to maintain the product in merchantable condition;
>
> (iii) Any failure to make such inspection, adjustments, tests or servicing as the vendor has agreed to make or normally undertakes to make in the usual course of business, in connection with the distribution or sale of the products, or
>
> (iv) Products which after distribution or sale by the named insured have been labeled or relabeled or used as a container, part or ingredient of any other thing or substance by or for the vendor."

Pacific failed to conduct any investigation to ascertain if the policy exclusions applied or to explain its reasons for not investigating in order to expeditiously resolve the coverage issue. See note 6 below.

4. The products liability suit was originally brought on March 27, 1974; the date of the accident was July 31, 1972. An affidavit in the record indicates that Montgomery demanded that Pacific provide a defense for it at least as early as June 28, 1974.

5. Other insurance carriers paid the remainder of the $125,000. settlement.

6. A portion of Pacific's delay was attributable to Pacific's assertion in answer to one of Montgomery's interrogatories that the aggregate total of liability on the policy might have been exceeded and that this possibility was being investigated. The trial court's opinion indicates the circumstances of this assertion:

> "In response to plaintiff's interrogatory concerning the policy limits, Pacific responded:

defending the products liability case to that point in the litigation.[5] Pacific did not reimburse Montgomery for the fees incurred in bringing the declaratory judgment action. Montgomery continued to prosecute the present action solely to recover the attorneys' fees expended in bringing the declaratory judgment action. The district court found that Pacific had a duty to defend Montgomery under the provisions of the contract and that Pacific's obduracy in refusing to either defend Montgomery or acknowledge its contractual obligations before settlement was not taken in good faith because the refusal was made without reasonable cause.[6] The district court's opinion acknowledged Pennsylvania's adherence to the American Rule, which disfavors the allowance of attorneys' fees in the absence of statutory or contractual obligation,[7] but

> 'The limits are $50,000.00 with a $15,000.00 deductible and $150,000.00 aggregate. Information is being obtained as to the amount previously paid out under this policy during the policy period and defendant reserves the right to file a supplemental answer when said information is obtained.'

Pacific did not answer plaintiff's interrogatory on its obligation to defend and indemnify Montgomery Ward but stated that the information necessary to answer the interrogatory was being sought and would be supplied 'in the near future.'

> "The information Pacific promised to supply was never provided. *Only when the case settled did it become clear that there was no $15,000.00 deductible provision and no policy limit of $150,000.00. There never had been a valid reason for the procrastination.*
>
> "Meanwhile, Montgomery Ward was forced to continue to defend itself and continued to answer Pacific's interrogatories concerning the amount of its expenses by saying that it was unable to estimate the eventual expenses incurred in defense of the Reed action (or the amount of a verdict). *Pacific continued to defend Hutchinson and continued to say that it was obligated to defend Montgomery Ward subject to the exclusions and limits already set forth.*"

*Montgomery Ward & Co. v. Pacific Indemnity Co.*, Opinion of June 18, 1976 (W.D.Pa., Civil No. 74–1161), at 4–6 of slip opinion (emphasis supplied). See, *e. g.*, Restatement of Torts, § 914, & pp. 12–13 below.

7. A leading authority offers this analysis of the legal principles applicable in this case:

> "General Rule of no recovery.

went on to conclude that the state law in this area would be inapplicable where bad faith was found. The court stated:

"The power to award such fees which are not ordinarily included in the costs is part of the historical equity jurisdiction of the federal courts. *Vaughn [Vaughan] v. Atkinson, supra,* 369 U.S. [527] at 530 [82 S.Ct. 997, 8 L.Ed.2d 88]. Therefore, where bad faith or its equivalent is found to exist, the court may award attorneys' fees irrespective of state law since the court's equitable powers transcend the applicable state law under those circumstances. See *Sprague v. Ticonic National Bank,* 307 U.S. 161, 166 [59 S.Ct. 777, 83 L.Ed. 1184] (1939); *Hall v. Cole,* 412 U.S. 1, [93 S.Ct. 1943, 36 L.Ed.2d 702] (1974). And this is true notwithstanding the general rule that state law will normally govern the award of attorneys' fees in diversity cases. *Toland v. Technicolor, Inc.,* 467 F.2d 1045, 1047 (10th Cir. 1972); *Culbertson v. Jno. McCall Coal Co., Inc.,* 495 F.2d 1403, 1406 (4th Cir.), *cert. den.* 419 U.S. 1033, [95 S.Ct. 516, 42 L.Ed.2d

"It has been a consistent rule throughout the United States that a litigant has no inherent right to have his attorneys' fees paid by his opponent or opponents. Such an item is not recoverable in the ordinary case as damages, nor as costs, and hence is held not allowable in the absence of some provision for its allowance either in a statute or rule of court, or some contractual provision or stipulation. This sweeping general rule has been applied in legions of cases to preclude recovery of attorneys' fees, whether by the plaintiff or by the defendant, from one's opponent in a civil action."

S. Speiser, Attorneys' Fees § 12.3 (1973) (hereinafter "Speiser") (footnotes omitted), citing, *inter alia, Re Kling,* 433 Pa. 118, 249 A.2d 552 (1969).

"The general American rule denying one the right to recover attorneys' fees from his opponent or opponents has been consistently applied throughout the United States in actions at law on contract claims, . . . a rather practical illustration . . . being the incurring of fees by one successfully maintaining an action on an insurance policy contract."

*Id.* § 12.4 (footnotes omitted), citing, *inter alia, Corace v. Balint,* 418 Pa. 262, 210 A.2d 882 (1965).

"The term 'costs' does not embrace 'counsel fees,' and there is, particularly in the United States, a well-known and long recog-

308] (1975). Thus, while we agree with defendant that the law of Pennsylvania would normally preclude the award of attorneys' fees, see *Arcos Corp. v. American Mutual Liability Ins. Co.* [350 F.Supp. 380 (E.D.Pa.), *aff'd without opinion,* 485 F.2d 678 (3d Cir. 1973)], the rule is inapplicable if defendant's refusal to defend was in bad faith."

The district court did not consider whether Pennsylvania courts would apply a "bad faith" exception to the American Rule under the circumstances of this case.

## II.

### A. *Alyeska and Diversity Actions*

The question of the recovery of attorneys' fees, was recently considered by the Supreme Court in *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). After pointing out the limited situations in which attorneys' fees may be awarded in federal question cases, the Court noted:

nized distinction between costs and allowances for attorneys' fees."

*Id.* § 12.5 (footnotes omitted), citing, *inter alia, Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967); *Commonwealth ex rel. Scherer v. Scherer,* 182 Pa.Super. 166, 126 A.2d 483 (1956).

"One of the most frequent and practical applications of the exception which allows recovery of attorneys' fees incurred in litigation resulting from defendant's breach of contract, as damages, notwithstanding the general rule that attorneys' fees are not recoverable as damages, is the rule that an insurer who wrongfully refuses to defend an action brought against the insured, claiming that the action is not covered by the policy, will be liable for the reasonable attorneys' fees incurred by the insured in maintaining his own defense.

"Where the insurer has wrongfully refused to defend, it may become liable not only for attorneys' fees in the one action in which the insured is sued, but for fees in all other actions involving the insured as a result of its breach."

*Id.* § 13.8 (footnotes omitted), citing, *inter alia, Springfield Township v. Indemnity Insurance Co.,* 361 Pa. 461, 64 A.2d 761 (1949).

"31. A very different situation is presented when a federal court sits in a diversity case. '[I]n an ordinary diversity case where the state law does not run counter to a valid federal statute or rule of court, and usually it will not, state law denying the right to attorney's fees or giving a right thereto, which reflects a substantial policy of the state, should be followed.' 6 J. Moore, Federal Practice ¶ 54.77[2], pp. 1712–1713 (2d ed. 1974) (footnotes omitted). See also 2 S. Speiser, Attorneys' Fees §§ 14:3; 14:4 (1973) (hereinafter Speiser); Annotation, Prevailing Party's Right to Recover Counsel Fees in Federal Courts, 8 L.Ed.2d 894, 900–901. Prior to the decision in *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), this Court held that a state statute requiring an award of attorneys' fees should be applied in a case removed from the state courts to the federal courts: '[I]t is clear that it is the policy of the state to allow plaintiffs to recover an attorney's fee in certain cases, and it has made that policy effective by making the allowance of the fee mandatory on its courts in those cases. It would be at least anomalous if this policy could be thwarted and the right so plainly given destroyed by removal of the cause

to the federal courts.' *People of Sioux County v. National Surety Co.,* 276 U.S. 238, 243, 48 S.Ct. 239, 241, 72 L.Ed. 547 (1928). The limitations on the awards of attorneys' fees by federal courts deriving from the 1853 Act were found not to bar the award. *Id.,* at 243–244, 48 S.Ct. at 241. We see nothing after *Erie* requiring a departure from this result. See *Hanna v. Plumer,* 380 U.S. 460, 467–468, 85 S.Ct. 1136, 1141–1142, 14 L.Ed.2d 8 (1965). *The same would clearly hold for a juridically created rule, although the question of the proper rule to govern in awarding attorneys' fees in federal diversity cases in the absence of state statutory authorization loses much of its practical significance in light of the fact that most States follow the restrictive American rule.* See 1 Speiser §§ 12:3; 12:4."

*Id.* at 259, note 31, 95 S.Ct. at 1622 (emphasis supplied).

 The plain meaning of the wording quoted is that state rules concerning the award of attorneys' fees are to be applied in diversity cases whether these rules provide for an award or deny it, provided such rules do not run counter to federal statutes or policy considerations.[8] See *Tryforos v. Ica-*

---

**8.** Prior to the time of the *Alyeska* decision, it was arguable that the power to award attorneys' fees when obdurate conduct was involved was a matter committed to the inherent equity discretion of a district court, even though federal jurisdiction existed only as a matter of diversity jurisdiction. See, *e. g.,* Speiser, note 7, *supra,* §§ 12.11, 13.3, 14.3. Apparently, the theory found its major support in *Vaughan v. Atkinson,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962) (attorneys' fees allowed to seaman in prosecuting suit for wrongfully withheld payments for maintenance and cure), and *Dodge v. Tulleys,* 144 U.S. 451, 12 S.Ct. 728, 36 L.Ed. 501 (1892) (attorneys' fees allowed in diversity suit on trust deed based upon a provision in the deed allowing for fees even though such provision was ineffective under state law). *Vaughan* involved a federal question and *Tulleys* seems to have been imbued with the rationale of *Swift v. Tyson,* [41 U.S. 1, 16 Pet. 1, 10 L.Ed. 865], which, of course, was thoroughly rejected in *Erie.* Significantly *Tulleys* was not cited in *Alyeska.* As *Alyeska* makes clear, the *Vaughan* rationale is limited to cases involving federal questions; in diversity suits, *Erie's* teachings apply to govern the award of attorneys' fees.

"We put to one side the considerations relevant in disposing of questions that arise when a federal court is adjudicating a claim based on a federal law. [Citing cases.] Our problem only touches transactions for which rights and obligations are created by one of the States, and for the assertion of which, in case of diversity of citizenship of the parties, Congress has made a federal court another available forum.

"Our starting point must be the policy of federal jurisdiction which *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 embodies."

*Guaranty Trust Co. v. York,* 326 U.S. 99, 101, 65 S.Ct. 1464, 1466, 89 L.Ed. 2079 (1945).

"In exercising their jurisdiction on the ground of diversity of citizenship, the federal courts, in the long course of their history, have not differentiated in their regard for State law between actions at law and suits in equity."

*Id.* at 103, 65 S.Ct. at 1467.

"From the beginning there has been a good deal of talk in the cases that federal equity is a separate legal system. And so it is, proper-

*rian Development Company, S. A.,* 518 F.2d 1258, 1265 (7th Cir. 1975), *cert. denied,* 423 U.S. 1091, 96 S.Ct. 887, 47 L.Ed.2d 103 (1976).

". . . choices between state and federal law are to be made not by application of any automatic 'litmus paper' criterion, but rather by reference to the policies underlying the *Erie* rule. . . .

"The *Erie* rule is rooted in part in a realization that it would be unfair for the character or result of a litigation materially to differ because the suit had been brought in a federal court.

. . . . .

"The decision was also in part a reaction to the practice of 'forum-shopping' which had grown up in response to the rule of *Swift v. Tyson,* 304 U.S. at 73–74, 58 S.Ct. at 819–820. That the *York* test was an attempt to effectuate these policies is demonstrated by the fact that the opinion

ly understood. The suits in equity of which the federal courts have had 'cognizance' ever since 1789 constituted the body of law which had been transplanted to this country from the English Court of Chancery. But this system of equity 'derived its doctrines, as well as its powers, from its mode of giving relief'. Langdell, Summary of Equity Pleading (1877) xxvii. In giving federal courts 'cognizance' of equity suits in cases of diversity jurisdiction, Congress never gave, nor did the federal courts ever claim the power to deny substantive rights created by State law or to create substantive rights denied by State law.

"This does not mean that whatever equitable remedy is available in a State court must be available in a diversity suit in a federal court, or conversely, that a federal court may not afford an equitable remedy not available in a State court. Equitable relief in a federal court is of course subject to restrictions: the suit must be within the traditional scope of equity as historically evolved in the English Court of Chancery [citing cases]; a plain, adequate and complete remedy at law must be wanting, . . . ; explicit Congressional curtailment of equity powers must be respected, . . . ; the constitutional right to trial by jury cannot be evaded, [citing case]. That a State may authorize its courts to give equitable relief unhampered by any or all such restrictions cannot remove these fetters from the federal courts. [Citing cases.] State law cannot define the remedies which a federal court must give simply because a federal court in diversity jurisdiction is avail-

framed the inquiry in terms of 'substantial' variations between state and federal litigation. 326 U.S., at 109, 65 S.Ct. at 1469. Not only are nonsubstantial, or trivial, variations not likely to raise the sort of equal protection problems which troubled the Court in *Erie* ; they are also unlikely to influence the choice of a forum. The 'outcome-determination' test therefore cannot be read without reference to the twin aims of the *Erie* rule: discouragement of forum-shopping and avoidance of inequitable administration of the laws.[9]

"[9] . . . *Erie* and its progeny make clear that when a federal court sitting in a diversity case is faced with a question of whether or not to apply state law, the importance of a state rule is indeed relevant, but only in the context of asking whether application of the rule would make so important a difference to the character or result of the litigation that failure to enforce it would unfairly discriminate against citizens of the forum State, or whether application of the rule would have so impor-

able as an alternative tribunal to the State's courts. Contrariwise, a federal court may afford an equitable remedy for a substantive right recognized by a State even though a State court cannot give it. Whatever contradiction or confusion may be produced by a medley of judicial phrases severed from their environment, the body of adjudications concerning equitable relief in diversity cases leaves no doubt that the federal courts enforced State-created substantive rights if the mode of proceeding and remedy were consonant with the traditional body of equitable remedies, practice and procedure, and in so doing they were enforcing rights created by the States and not arising under any inherent or statutory federal law."

*Id.* at 105–107, 65 S.Ct. at 1468 (footnotes omitted).

"Here we are dealing with a right to recover derived not from the United States but from one of the States. When, because the plaintiff happens to be a non-resident, such a right is enforceable in a federal as well as in a State court, the forms and mode of enforcing the right may at times, naturally enough, vary because the two judicial systems are not identic. But since a federal court adjudicating a State-created right solely because of diversity of citizenship of the parties is for that purpose, in effect, only another court of the State, it cannot afford recovery if the right to recover is made unavailable by the State nor can it substantially affect the enforcement of the right as given by the State."

*Id.* at 108–109, 65 S.Ct. at 1469–1470.

tant an effect upon the fortunes of one or both of the litigants that failure to enforce it would be likely to cause a plaintiff to choose the federal court."

*Hanna v. Plumer,* 380 U.S. 460, 467–68 & note 9, 85 S.Ct. 1136, 14 L.Ed.2d 8. The *Alyeska* Court's citation to *Hanna* is significant because the same policy considerations which formed the foundation of *Hanna* and the line of cases following *Erie* would apply, of necessity, were a federal court to engraft federal notions of attorneys' fees awards onto state substantive rights tried in a diversity action. It is apparent that permitting an award of attorneys' fees in a federal court but denying them for an identical action brought in a state court would represent a significant reason to choose the federal forum. Even if we assume that this difference could be restricted to cases involving obdurate conduct or bad faith, it is clear that the possibility of such an award in many cases would color the substantive aspects of the case and could significantly alter the legal theories presented by the parties as a claim or defense. Under *Erie*

and *Hanna,* such a federal shaping of the state substantive right is unwarranted.[9]

This does not mean that the federal forums are to become a haven for the obdurate and the vexatious: first, it may be expected that the attorneys, as officers of the court, will adhere to the rightful boundaries of zealous advocacy; second, the Federal Rules of Civil Procedure provide sanctions in the form of reasonable expenses, including reasonable attorneys' fees, which may be assessed against an offending party, see Moore's, *supra,* at 1715; third, in the extreme case, the district court may conclude that state courts would apply an exception to the American Rule to award attorneys' fees because failure to remedy the obdurate conduct or bad faith would undermine a major area of state policy or substantive law.[10]

### B. *State Law* [11]

It is clear as a general matter that Pennsylvania courts adhere to a close appli-

9. As the *Alyeska* Court's citation to *Sioux County* indicates, a state statute awarding attorneys' fees may be a means of effectuating major policies of the state as well as creating a substantive right in its own terms. Identical policy considerations apply where no right to recover fees exists and, as the quotations in note 8, above indicate, we may not create a substantive right even as a matter of the equitable power of the court, where the state does not give it.

> "We are reminded by the *Erie* opinion that neither *Congress* nor the *federal* courts can, under the guise of formulating rules of decision for federal courts, fashion rules which are not supported by a grant of federal authority contained in Article I or some other section of the Constitution; in such areas state law must govern because there can be no other law."

*Hanna, supra,* at 471–72, 85 S.Ct. at 1144. See also *Prudential Insurance Co. v. Carlson,* 126 F.2d 607 (10th Cir. 1942). (In a diversity suit on a New Jersey accident policy, brought in a federal court in Kansas, the New Jersey substantive law was applied, including the New Jersey rule under which attorneys' fees were not recoverable, and a Kansas statute providing for the recovery of attorneys' fees as costs in suits against insurance companies was held inapplicable, since it created a substantive right.)

10. This last suggestion, of course, assumes that the state courts have not considered the question under circumstances similar to those in the instant case. When the state has considered the question, we would apply the state determination to grant or withhold the award as a matter of *stare decisis* under *Erie.* See, e. g., *Blum v. William Goldman Theatres, Inc.,* 164 F.2d 192, 198 (3d Cir. 1947).

11. Because the parties did not raise any conflict of laws issue in the district court and do not raise it on appeal, under applicable conflict of laws principles the law of the forum (Pennsylvania) would govern the substantive issues due to the absence of facts justifying the application of the law of some other jurisdiction. See *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). We note that, unlike *Parkway Baking Company v. Freihofer Baking Company,* 255 F.2d 641, 646 (3d Cir. 1958), no conflict of laws issue was raised on appeal in this case. Montgomery, Pacific and Royal, the parties to the insurance contract, are incorporated in Illinois, California and Kansas respectively. Had a conflicts issue been raised under Pennsylvania conflict of laws theories, it would appear that the court would have applied the insurance law of one of the abovementioned jurisdictions. It would appear that all three of the foregoing jurisdictions would allow an award of attorneys' fees under the circumstances of

cation of the American Rule, which precludes the award of attorneys' fees. For instance, in *Corace v. Balint,* 418 Pa. 262, 210 A.2d 882 (1965), the Pennsylvania Supreme Court vacated an award of attorneys' fees with its oft repeated statement that:

> " '* * * Over and over again we have decided there can be no recovery for counsel fees from the adverse party to a cause, in the absence of express statutory allowance of the same * * *', *Smith v. Equitable Trust Co.,* 215 Pa. 413, 417, 64 A. 591, 592 (1906), or clear agreement by the parties, *Fidelity-Philadelphia Trust Company v. Philadelphia Transportation Company,* 404 Pa. 541, 548, 173 A.2d 109, 113 (1961), or some other established exception, see *Hempstead v. Meadville Theological School,* 286 Pa. 493, 134 A. 103, 49 A.L.R. 1145 (1926)."

*Id.* at 271–72, 210 A.2d at 887. Although it appears that an award of attorneys' fees would not lie in Pennsylvania in a suit for ordinary breach of contract or specific performance of a contract, see *Balint, supra* at 273, 210 A.2d at 888, an insured may recover attorneys' fees expended in defending an initial negligence action against him in a later action on the contract of insurance against the insurer who wrongfully refused to defend the earlier action. See, *e. g., Cadwallader v. New Amsterdam Casualty Co.,* 396 Pa. 582, 152 A.2d 484 (1959). In addition, the Pennsylvania Supreme Court has permitted the imposition of attorneys' fees on the offending party as a part of the fine imposed in civil contempt proceedings where contumacious or obdurate conduct has been involved. See *Bata v. Central-Penn National Bank of Philadelphia,* 448 Pa. 355, 372 & n. 13, 293 A.2d 343, 352–53 & n. 13 (1972); *Brocker v. Brocker,* 429 Pa. 513, 520, 241 A.2d 336, 339 (1968); *Lichtenstein v. Lichtenstein,* 481 F.2d 682, 684 (3d Cir. 1973).[12]

We are aware of no Pennsylvania case which has applied the "obdurate behavior" or "bad faith" exception to the general American Rule concerning the award of attorneys' fees in a declaratory judgment action involving contract. However, *Bata* and *Brocker* suggests, at least by analogy, that if the Pennsylvania Supreme Court were to consider the question they would apply the "obdurate behavior" exception consistently with the broad outlines reiterated in *Balint, supra.*[13]

---

this case. See, *e. g., Diamond Shamrock Corp. v. Lumbermens Mutual Casualty Co.,* 466 F.2d 722, 730 (7th Cir. 1972) (discussing Ill.Rev.Stat. ch. 73, § 767); discussion in Speiser, note 7, *supra,* §§ 13.4, 13.8, 13.41, 13.43 and cases cited therein. However, in the absence of statute, foreign law or rights thereunder to be given effect must be proved like any other fact, in the absence of which the law of the forum is ordinarily applied. See 15A C.J.S. Conflict of Laws § 3(9), and Pennsylvania cases cited therein; *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

12. After quoting with approval the following statement of law by the district court, Judge Aldisert, speaking for this court, stated in footnote 1 at 481 F.2d at 684 that "our research discloses no difference between [the law of Pennsylvania and federal law] in this area":

> ". . . where a losing party has brought an action or raised a defense in bad faith, vexatiously, wantonly or for oppressive reasons an award of counsel fees to the other party is appropriate."

*Lichtenstein v. Lichtenstein,* 481 F.2d 682, 684 (3d Cir. 1973).

13. Apparently, the Pennsylvania courts have not considered a case cojoining the elements of a breach of an insurance contract with bad faith and obdurate conduct. *Cadwallader, supra, Bata, supra,* and *Brocker, supra,* allowed those fees to the prevailing party where only one of those three elements was present. *Cf.,* also, *Barnett v. Reed,* 51 Pa. 190 (1865) (counsel fees allowed in a tort action for malicious abuse of process). None of these cases was a declaratory judgment action, however. On the other hand, both *Bata* and *Brocker* illustrate that when strong public policy exists for a party to perform a duty imposed by law and it is not performed because of obdurate behavior or bad faith, the Pennsylvania courts will not hesitate to impose attorneys' fees in appropriate circumstances to insure the private right is vindicated and as an additional incentive to protect the public policy aspects of the action. This has its counterpart in this case, since it has long been the law in Pennsylvania that, in the absence of special circumstances such as actual fraud, an insurer has a duty to defend its insured and may refuse to do so only at its peril.

Also, even if Pennsylvania would not generally adopt the bad faith exception to the American Rule, there is reason to expect that the Pennsylvania courts would allow recovery of attorneys' fees in the circumstances of this case as a matter of public policy in order to prevent insurers from frustrating the contractual rights of the insured by forcing the insureds to bring a declaratory judgment action when the refusal to defend was unreasonable and in bad faith.

■ The Pennsylvania Unfair Insurance Practices Act, 40 P.S. §§ 1171.1, et seq., provides in 40 P.S. § 1171.5(10)i–vi and xiv:

"(10) Any of the following acts if committed or performed with such frequency as to indicate a business practice shall constitute unfair claim settlement or compromise practices:

"(i) Misrepresenting pertinent facts or policy or contract provisions relating to coverages at issue.

"(ii) Failing to acknowledge and act promptly upon written or oral communications with respect to claims arising under insurance policies.

"(iii) Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies.

"(iv) Refusing to pay claims without conducting a reasonable investigation based upon all available information.

"(v) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed and communicated to the company or its representative.

"(vi) Not attempting in good faith to effectuate prompt, fair and equitable set-tlements of claims in which the company's liability under the policy has become reasonably clear.

. . . . .

"(xiv) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement."

The Act goes on to provide for a system of administration to investigate violations and authority within the broad responsibility of the State Insurance Commissioner to impose civil fines. Thus, it is clear that obdurate behavior and bad faith on the part of an insurer in refusing to defend an insured is contrary to explicit expressions of state law and policy as found in the expressions of the Pennsylvania courts and legislature.[14]

■ Under the facts presented in this case, Pennsylvania law required Pacific to defend Montgomery under the provisions of the contract with Royal under which Montgomery was an additional insured. Since Montgomery had established a prima facie case of coverage, Pacific was obliged to defend Montgomery "even if such suit was groundless, false or fraudulent" or to make a prompt and thorough investigation to establish that other insurance or policy limitations or exceptions would have insulated it from ultimate liability; it did neither. The district court found that Pacific never had a valid reason for its procrastination and that its obduracy was not in good faith. These findings of fact are well supported in the record. We disagree with Pacific's final contention that material issues of fact remain which make summary judgment improper.

For the reasons stated, the judgment of the district court will be affirmed.

---

14. We, of course, do not hold that any section of the Pennsylvania insurance laws provide for a statutory right of recovery in this case. We cite them here merely for their expression of public policy and as a step in our conclusion that in consideration of this policy state courts would have allowed an award of attorneys' fees in the circumstances of this case.

We note that this is not a case such as *Straub v. Vaisman,* 540 F.2d 591, 600 (3d Cir. 1976), where the vexatious conduct took place solely prior to the commencement of the litigation. The vexatious conduct here was pre-litigation insofar as the refusal to defend the products liability claim is concerned, as well as post-litigation in the continued refusal to defend from 12/5/74 (when the instant action was started) to 6/24/75 (the date of the products liability settlement), which was followed by the subsequent acknowledgment by Pacific of its liability for that claim and of its duty to defend such claim.

GIBBONS, Circuit Judge, concurring:

I join in the court's judgment because I believe the result would be the same whether we applied Pennsylvania law or a federal rule. The prediction made by Judge Van Dusen that Pennsylvania would follow *Vaughan v. Atkinson*, 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962), and allow an award of attorneys' fees, is convincing. I do not agree, however, that in a state which would not follow *Vaughan v. Atkinson,* a federal forum would be precluded from awarding attorneys' fees for what amounts to a vexatious abuse of its process. I regard the award of attorneys' fees on the authority of *Vaughan v. Atkinson* as more in the nature of costs than are such awards under the other exceptions to the American rule. Certainly the notions of federalism which underlie the *Erie* rule do not require that a federal forum accept the public policy of the state in which it happens to sit on a matter such as the award of costs for abuse of its process. *Cf. Byrd v. Blue Ridge Cooperative,* 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958). The issue need not, of course, be resolved here.